### In re POLYMEDICA CORP. SECURITIES LITIGATION.

### No. CIV.A. 00–12426–REK.

United States District Court, D. Massachusetts.

Sept. 7, 2004.

NY, Daniel E. Rosenfeld, Kirkpatrick & Lockhart, Boston, MA, Jeffrey B. Rudman, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Boston, MA, Allan J. Sullivan, Baker & McKenzie, Miami, FL, for defendants.

Theodore M. Hess–Mahan, Shapiro, Haber & Urmy LLP, Boston, MA, Robert A. Izard, Schatz & Nobel, P.C., Hartford, CT, Jeffrey Nobel, Schatz & Nobel, P.C., Hartford, CT, Andrew M. Schatz, Schatz & Nobel, P.C., Hartford, CT, Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Boston, MA, for Plaintiffs.

## MEMORANDUM IN EXPLANATION, ORDER OF CERTIFICATION, AND PRACTICE AND PROCEDURE ORDER NO. 4

KEETON, Senior District Judge.

Practice and Procedure Order No. 4 supplements and does not supercede Practice and Procedure Orders No. 1–3.

The next case management conference is set for **Thursday, October 7, 2004 at 2:30 p.m.**

### I. Pending Matters

Pending for decision before this court are matters related to the following filings:

(1) Lead Plaintiff's Motion for Class Certification (Docket No. 61, filed January 28, 2004), with Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification (Docket No. 62, filed January 28, 2004);

(2) Defendants PolyMedica Corporation and Liberty Medical Supply Inc.'s Opposition to Lead Plaintiff's Motion for Class Certification (Docket No. 65, filed February 27, 2004), with Affidavit of Denise Neumann Martin (Docket No. 66, filed February 27, 2004), and Affidavit of Robert C. Apfel (Docket No. 67, filed February 27, 2004);

(3) Defendant Steven J. Lee's Joinder in Defendants PolyMedica Corporation and Liberty Medical Supply Inc.'s Opposition to Lead Plaintiff's Motion for Class Certification (Docket No. 69, filed February 27, 2004);

(4) Notice of Defendants Warren K. Trowbridge and Eric Walters' Joinder in Defendants PolyMedica Corporation and Liberty

Steven R. Astley, Hunton & Williams LLP, Miami, FL, Michael G. Bongiorno, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Boston, MA, Gus P. Coldebella, Goodwin Procter, LLP, Boston, MA, Michael DeMarco, Kirkpatrick & Lockhart, LLP, Boston, MA, Yordanka V. Delionado, Hunton & Williams, Miami, FL, Anthony M. Feeherry, Goodwin Procter, LLP, Boston, MA, Stuart M. Glass, Goodwin Procter, LLP, Boston, MA, Jeffrey W. Gutchess, Hunton & Williams, New York,

Medical Supply Inc.'s Opposition to Lead Plaintiff's Motion for Class Certification (Docket No. 70, filed February 27, 2004);

(5) Lead Plaintiff's Reply Memorandum of Law in Support of Motion for Class Certification (Docket No. 76, filed April 12, 2004), with Affidavit of Alan R. Miller (Docket No. 77, filed April 12, 2004);

(6) Surreply Memorandum in Support of Defendants PolyMedica Corporation and Liberty Medical Supply, Inc.'s Opposition to Lead Plaintiff's Motion for Class Certification (Docket No. 82, filed May 5, 2004), with Supplemental Affidavit of Denise Neumann Martin (Docket No. 83, filed May 5, 2004);

(7) Defendant Steven J. Lee's Joinder in Surreply Memorandum in Support of Defendants PolyMedica Corporation and Liberty Medical Supply Inc.'s Opposition to Lead Plaintiff's Motion for Class Certification (Docket No. 78, filed May 6, 2004);

(8) Joinder by Defendant, Warren K. Trowbridge, in Memoranda Submitted by PolyMedica Corporation in Opposition to Plaintiff's Motion for Class Certification (Docket No. 84, filed May 6, 2004);

(9) Lead Plaintiff's Memorandum of Law in Further Support of Motion for Class Certification and in Response to Defendants' Surreply Memorandum of Law (Docket No. 87, filed May 21, 2004);

(10) Transcript of Motion Hearing on June 2, 2004 (Docket No. 91, filed July 16, 2004).

## II. Relevant Background

This is a consolidated action seeking to recover damages on behalf of a class for alleged violations by defendants of (1) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5 promulgated thereunder, and (2) Section 20(a) of the Exchange Act.

Defendants have admitted to the following facts, among others. Defendant PolyMedica is a Massachusetts Corporation with its principal place of business in Woburn, Massachusetts. Defendant Liberty Medical Supply, Inc. ("Liberty") is a Florida Corporation with its headquarters located in Port St. Lucie, Florida. Liberty is a wholly owned subsidiary of PolyMedica. During the proposed class period (October 26, 1998 through August 21, 2001), PolyMedica stock traded on the NASDAQ and the American Stock Exchange (AMEX).

Plaintiffs allege that

[d]efendants carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive the investing public, including plaintiffs and other Class members . . .; (ii) artificially inflate and maintain the market price of PolyMedica common stock; and (ii) cause plaintiffs and other members of the Class to purchase PolyMedica stock at artificially inflated prices.

(Consol. Compl., Docket No. 20, at 62.) The alleged conduct includes misrepresentations of sales, revenues, and accounts receivable, as well as the issuance of false press releases.

The original actions were Civil Action No. 00–12426–REK, which was filed in this court by Richard Bowe SEP–IRA on November 27, 2000, and Civil Action No. 00–12586–REK, which was filed by Trust Advisors Equity Plus LLC on December 19, 2000. On July 30, 2001, this court issued Practice and Procedure Order No. 1 (Docket No. 16), in which it approved the consolidation of the two actions. In the same Order, this court allowed a motion that sought (a) the appointment of Richard Bowe SEP–IRA, John B. Muha, and Thomas C. Thuma as "lead plaintiffs" and (b) the approval of the lead plaintiffs' choice of "lead counsel."

On October 9, 2001, lead plaintiffs and three other plaintiffs filed a consolidated complaint (Docket No. 20).

On January 28, 2004, lead plaintiff Thomas Thuma filed the pending motion for class certification (Docket No. 61). Defendants have opposed the motion.

## III. Disposition

### A. Introduction and Legal Standard

Lead plaintiff Thomas Thuma seeks certification of a class consisting of all purchasers of PolyMedica Corporation common stock from October 26, 1998 through August 21, 2001, inclusive. Plaintiff Thuma also seeks

to have himself appointed as "Class Representative."

Plaintiff correctly notes that "[c]lass actions have long been considered a necessary and effective vehicle for resolution of securities law claims." (Pl.'s Memo., Docket No. 62, at 3.) As an able colleague on this court has stated, "Courts have expressed a general preference in securities fraud cases based on a policy favoring enforcement of the federal securities laws and recognition of the fact that class actions may be the only practicable means of enforcing investors' rights." *Priest v. Zayre Corp.*, 118 F.R.D. 552, 553–54 (D.Mass.1988) (Zobel, J.) (citations omitted); *see also, e.g., Blackie v. Barrack*, 524 F.2d 891, 903 (9th Cir.1975).

■■■ Nevertheless, to gain class certification certain requirements must be met under Rule 23 of the Federal Rules of Civil Procedure. The four prerequisites of subsection 23(a)—numerosity, commonality, typicality, and adequacy of representation—must be satisfied. *See, e.g., Tardiff v. Knox County*, 365 F.3d 1, 4 (1st Cir.2004); *Smilow v. S.W. Bell Mobile Sys.*, 323 F.3d 32, 38 (1st Cir.2003). The language of the subsection is as follows:

> (1) the class is so numerous that joinder of all members is impracticable,
>
> (2) there are questions of law or fact common to the class,
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). The proposed class also must qualify under one of the three subdivisions of Rule 23(b). *See, e.g., Priest*, 118 F.R.D. at 553. Plaintiff bears the burden of showing that all the Rule 23 requirements have been met. *See, e.g., id.; Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303, 305 (D.Mass.1987) (Wolf, J.).

■■■ The district court "must conduct a rigorous analysis of the prerequisites ... before certifying a class." *Smilow*, 323 F.3d at 38 (citing *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). Plaintiff contends that this analysis "is not an inquiry into the merits of the plaintiff's case, but is limited to ... the allegations in the Complaint." (Pl.'s Memo., Docket No. 62, at 3.) Defendants contest plaintiff's assertion. They argue that this court should look "beyond the pleadings to determine whether plaintiff[ ] ha[s] satisfied the criteria for [class] certification." (Def.'s Opp., Docket No. 65, at 3.)

This dispute between the parties regarding the appropriate level of inquiry and analysis for class certification is not an easy one to resolve. Notably, the federal circuits are divided, and the conflicting positions each rely on Supreme Court case law. *See* Jeffrey L. Oldham, *Taking "Efficient Markets" Out of the Fraud–on–the–Market Doctrine After the Private Securities Litigation Reform Act*, 97 NW. U.L.Rev. 995, 1019–20 (2003). On the one hand, the Second Circuit cautions against any factual inquiry by a district court on a motion for class certification, requiring the district court to look no further than the allegations in the complaint. *See, e.g., Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 291–93 (2d Cir.1999). In support of this position, the Second Circuit relies on *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), in which the Supreme Court concluded that "nothing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Id.* at 177, 94 S.Ct. 2140; *see also Caridad*, 191 F.3d at 291, 293 (citing *Eisen*, 417 U.S. at 177, 94 S.Ct. 2140).

On the other hand, several circuits require a district court to make factual and legal inquiries beyond the allegations in the complaint if such inquiries are necessary to an informed ruling on class certification. *See, e.g., Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365–67 (4th Cir.2004); *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 186–89 (3d Cir.2001); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675–76 (7th Cir.2001). These circuits rely on *General Telephone Co. of Southwest v. Falcon*, in which the Supreme Court stated the following:

As we noted in *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351, "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id.,* at 469, 98 S.Ct., at 2458 (quoting *Mercantile Nat. Bank v. Langdeau,* 371 U.S. 555, 558, 83 S.Ct. 520, 522, 9 L.Ed.2d 523).... *[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (emphasis added) [hereinafter *Falcon*].

The First Circuit has not addressed the issue squarely, but it appears to favor a more searching inquiry. In *Waste Management Holdings, Inc. v. Mowbray,* 208 F.3d 288 (1st Cir.2000), a panel of the court acknowledged the Supreme Court's instructions in *Falcon.* The panel noted both the Court's "reiterat[ion]" that "'class determination generally involves considerations that are enmeshed in ... factual and legal issues'" and the Court's "suggest[ion]" that "'sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.'" *Id.* at 297 (quoting *Falcon,* 457 U.S. at 160, 102 S.Ct. 2364). More recently, in April 2004, a panel of the First Circuit stated the following in dicta:

It is sometimes taken for granted that the complaint's allegations are necessarily controlling; but class action machinery is expensive and *in our view a court has the power to test disputed premises early on if and when the class action would be proper on one premise but not another.*

*Tardiff,* 365 F.3d at 4–5 (emphasis added). And in a footnote to this sentence, the panel noted the circuit split that I explained above and implied that it sided with those in favor of more inquiry.

My colleagues on district courts in this circuit, however, are divided. Judge Lisi of the United States District Court for the District of Rhode Island and Judge Carter of the District of Maine both have taken the position that any preliminary inquiry at the class certification stage is inappropriate. *See*

*Kinney v. Metro Global Media, Inc.,* No. Civ. A. 99–579 ML, 2002 WL 31015604, at *3 (D.R.I. Aug.22, 2002) (Lisi, J.) (unpublished decision); *In re the One Bancorp Secs. Litig.,* 136 F.R.D. 526, 532 (D.Me.1991) (Carter, C.J.). Magistrate Judge Hagopian of the District of Rhode Island, however, notes that "'[b]efore deciding whether to allow a case to proceed as a class action ... [courts] should make whatever factual and legal inquiries are necessary under Rule 23.'" *Bond v. Fleet Bank (RI), N.A.,* No. Civ. A. 01–177 L., 2002 WL 31500393, at *2 (D.R.I. Oct.10, 2002) (Hagopian, Mag. J.) (unpublished decision) (quoting *Szabo,* 249 F.3d at 676).

■ I am persuaded that, if presented the issue before me now, the First Circuit would conclude that a district court may make "whatever factual and legal inquires are necessary under Rule 23." *Szabo,* 249 F.3d at 676. I therefore reach such a conclusion now. I rely on the fact that the considered dicta of the First Circuit and the majority of the circuits that have faced this issue reach the same conclusion. Moreover, it is certainly true that, in *Eisen,* the Supreme Court cautioned district courts against reaching the merits of a case at the class certification stage. *See* 417 U.S. at 177, 94 S.Ct. 2140. But taking this caution as a mandate to avoid *any and all* inquiry is "a misreading of a single sentence in *Eisen,* coupled with a disregard of subsequent Supreme Court authority." *O'Neil v. Appel,* 165 F.R.D. 479, 496 (W.D.Mich.1996). I agree with the reasoned judgment of the Fourth Circuit:

*Eisen* simply restricts a court from expanding the Rule 23 certification analysis to include consideration of whether the proposed class is likely to prevail ultimately on the merits. As the Supreme Court itself stated in [*Falcon,*] a post-*Eisen* case, "sometimes it may be necessary for the [district] court to probe behind the pleadings before coming to rest on the certification question." *Falcon,* 457 U.S. at 160, 102 S.Ct. 2364.

Thus, while an evaluation of the merits to determine the strength of plaintiffs' case is not part of a Rule 23 analysis, the factors spelled out in Rule 23 must be addressed

through findings, even if they overlap with issues on the merits.

*Gariety,* 368 F.3d at 366 (some citations omitted).

■ It is important, of course, still to respect the obligation imposed by the Supreme Court in *Eisen.* In particular, any findings at the class certification stage may not in fact decide the merits. Accordingly,

> [t]he findings made for resolving a class action certification motion serve the court *only* in its determination of whether the requirements of Rule 23 have been demonstrated.
>
> [A] concern that Rule 23 findings might prejudice later process on the merits need not lead to the conclusion that such findings cannot be made. The jury or factfinder can be given free hand to find all of the facts required to render a verdict on the merits, and if its finding on any fact differs from a finding made in connection with class action certification, the ultimate factfinder's finding on the merits will govern the judgment.

*Gariety,* 368 F.3d at 366.

■ I also note that a court need not always look beyond the pleadings. I conclude nevertheless that I should do so in this case, in which defendants dispute plaintiff's allegations and assertions. The appropriateness of doing so is reinforced in this case by consideration of the interests of absent class members. *See id.* at 366–67 ("When a district court considers whether to certify a class action, it performs the public function of determining whether the representative parties should be allowed to prosecute the claims of absent class members.").

I turn now to the substantive disposition of plaintiff Thuma's motion for class certification. For the reasons explained below, I conclude that plaintiff Thuma's motion should be granted. In the Order of Certification, I accordingly certify the proposed class and appoint Dr. Thuma the class representative.

## B. Requirements of Rule 23(a)

### 1. Numerosity

■ The first prong under Rule 23(a) requires that the class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a). Plaintiff alleges that the number of qualified shareholders of PolyMedica stock is in the thousands, and that they are scattered throughout the United States. Defendants do not suggest that plaintiff fails to meet the numerosity requirement.

■ The record supports plaintiff's allegation. Defendants have admitted that, in June 2002, PolyMedica had more than twelve million shares of common stock outstanding and the average daily trading volume exceeded one hundred thousand shares. I take judicial notice of the fact that the average daily trading volume also exceeded one hundred thousand shares during the proposed class period (October 26, 1998 to August 21, 2001). *Cf. La Grasta v. First Union Secs.,* 358 F.3d 840, 842 (11th Cir.2004) (taking judicial notice of stock prices in a securities fraud class action).

In securities fraud class actions, federal courts frequently infer from facts such as these that the numerosity requirement is satisfied. *See Kirby,* 116 F.R.D. at 306; *see also McCuin v. Secretary of Health and Human Services,* 817 F.2d 161, 167 (1st Cir. 1987) (noting that "district courts may draw reasonable inferences from the facts presented" when assessing the prerequisite of numerosity). I draw such an inference here and find that the number of class members is sufficiently numerous to meet the Rule 23(a)(1) requirement.

### 2. Commonality

■ Rule 23(a)(2) requires that questions of law or fact be shared by the prospective class, but does not require that every question be common. *See Kirby,* 116 F.R.D. at 306. Plaintiff suggests that several common questions of law and fact exist. Defendants do not contend otherwise.

I find that the prospective class shares several questions of law or fact. The claims in this civil action all require proof of a violation of Rule 10b–5 under the Exchange Act. The class will need to show that (1) defendants made a materially false or mis-

leading statement or failed to state a fact necessary to make a statement not misleading; (2) in connection with the purchase or sale of a security; (3) with the intent to deceive, manipulate, or defraud; and that (4) class members were injured by their reasonable reliance on defendants' misrepresentations. *See Wortley v. Camplin*, 333 F.3d 284, 294 (1st Cir.2003). Elements (1) through (3) present several common questions, including:

(1) Whether defendants misrepresented and/or failed to disclose facts in PolyMedica's press releases, annual reports, and quarterly reports;

(2) Whether the misrepresentations or omissions were material;

(3) Whether the conduct alleged was performed with scienter;

(4) Whether the conduct alleged artificially inflated the price of PolyMedica stock during the proposed class period; and

(5) Whether the alleged misrepresentations and omissions were part of a common course of conduct designed to inflate the market price of PolyMedica stock.

These questions are "illustrative rather than exhaustive, but establish the existence of the commonality required by Rule 23." *Kirby*, 116 F.R.D. at 306.

I find that plaintiff has satisfied the second prerequisite of Rule 23(a).

### 3. Typicality

▮▮▮▮ The third prerequisite under Rule 23(a) addresses the certification of the lead plaintiff. Under Rule 23(a)(3), plaintiff Thuma's claims must be typical of the claims of the proposed class. "The central inquiry in determining whether a proposed class has 'typicality' is whether" the class representatives' claims "have the same essential characteristics as the claims of the other members of the class." *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 491 (S.D.Fla.2003) (quoting *In re Amerifirst Secs. Litig.*, 139 F.R.D. 423, 428 (S.D.Fla.1991)). The plaintiff "need not show substantial identity between [his] claims and those of absent class members, but need only show that [his] claims arise from the same course of conduct that gave rise to the claims of the absent members."

*Priest*, 118 F.R.D. at 555 (internal quotation marks omitted).

Plaintiff Thuma (the proposed class representative) contends that he, "like the absent Class members, purchased his PolyMedica stock during the Class Period at prices that were artificially inflated due to Defendants' material misrepresentations, and suffered losses as a result thereof. [His] claims are based upon the same facts and legal theories as the rest of the Class." (Pl.'s Memo., Docket No. 62, at 5.) Dr. Thuma asserts that he thus satisfies the typicality requirement. Defendants do not contest this assertion.

I am persuaded that plaintiff Thuma's claims are typical of the claims of the class. Accordingly, I find that plaintiff has met the third prerequisite under Rule 23(a).

### 4. Adequacy of Representation

▮▮▮▮ Rule 23(a)(4) also addresses the certification of the lead plaintiff. "Inquiries into the adequacy of representation should focus on the named plaintiff['s] ability to prosecute the action vigorously through qualified counsel and [his] lack of conflicting interest with unnamed class members." *Priest*, 118 F.R.D. at 556 (internal quotation marks omitted); *see also Kirby*, 116 F.R.D. at 308–09 ("The two basic guidelines for meeting the adequacy of representation standard of Rule 23(a)(4) are: (1) the absence of potential conflict between the named plaintiffs and the class members and (2) . . . assurance of vigorous prosecution." (internal quotation marks omitted)).

Plaintiff easily meets the requirement of vigorous prosecution through qualified counsel. The record demonstrates that plaintiff's attorneys have significant experience in federal securities class litigation. (Pl.'s Memo., Docket No. 62, at 6.) Defendants do not contend otherwise. In addition, plaintiff points to evidence in the record that shows his own vigorous interest in the class action: he has reviewed the pleadings and consults regularly with the attorneys. (*Id.* at 7.) Such evidence is also persuasive, though not necessary in light of the proven competency of plaintiff's counsel. *See Cheney*, 213 F.R.D. at 495 ("In securities cases, where the class is represented by competent counsel, class

certification should not be denied simply because of a perceived lack of subjective interest on the part of the named plaintiffs unless their participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case." (internal quotation marks omitted)). Defendants do not contest this evidence either.

As for whether plaintiff Thuma has a conflict of interest with the unnamed class members, plaintiff offers that he "seeks to prove that the same wrongdoing that caused his damages also caused the damages suffered by the Class." (Pl.'s Memo., Docket No. 62, at 6.) Allegations to this effect also appear in the complaint. (Consol. Compl., Docket No. 20, ¶ 23.) Defendants do not contend that plaintiff has any conflict of interest. In these circumstances, I find that plaintiff has no conflict of interest with the unnamed class members.

Accordingly, I find that plaintiff satisfies the fourth prerequisite under Rule 23(a).

### 5. Conclusion

For the foregoing reasons, I find that all of the Rule 23(a) prerequisites to class certification are met.

## C. Rule 23(b) Requirements

### 1. 23(b)(1) and 23(b)(2)

■ As explained earlier, a proposed class must also fit one of the three subdivisions of Rule 23(b). Plaintiff seeks certification under Rule 23(b)(3). I look first, however, to whether the proposed class qualifies under Rule 23(b)(1) or Rule 23(b)(2). I do so because "where the stricter requirements of 23(b)(1) and 23(b)(2) are squarely presented by the plaintiffs' claims Rule 23(b)(3) is not applicable.... To apply 23(b)(3) [in such circumstances] would run the serious risk of negating the very purpose for which [23(b)(1) and 23(b)(2) ] were promulgated." *Van Gemert v. Boeing Co.*, 259 F.Supp. 125, 130–31 (S.D.N.Y.1966); *see also In re New England Mutual Life Ins. Co. Sales Practices Litig.*, 183 F.R.D. 33, 40 (D.Mass.1998) (Keeton, J.) ("When the specific facts of a case warrant certification under either 23(b)(1) or 23(b)(3), the general practice is to certify the class

under 23(b)(1), whether or not the court also certifies under 23(b)(3).").

■ I turn first to 23(b)(1). Subsection (b)(1) authorizes a class action if

the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests ....

Fed.R.Civ.P. 23(b)(1). The present factual situation does not warrant a finding of either of the risks explained above. These risks are premised on the prosecution of individual actions. But the proposed class includes small claimants who, in the event that the class is not certified, are unlikely to prosecute separate individual actions. In all probability, the costs and expenses of individual suits would far exceed any individual recoveries. *See, e.g., In re Blech Secs. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y.1999) ("Most violations of the federal securities laws ... inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible.... [A]lthough a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his behalf."). In fact, plaintiffs allege in the consolidated complaint that individual actions are "impossible." (*See* Consol. Compl., Docket No. 20, ¶ 25 ("As the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigations make it impossible for members of the Class individually to seek redress for the wrongs done to them.").) Defendants do not contend otherwise.

Accordingly, I find 23(b)(1) inapplicable to the case at bar. Indeed, "[n]umerous courts have held that class actions under the securities laws are not appropriate for class action treatment under (b)(1)." *Crasto v. Estate of Kaskel*, 63 F.R.D. 18, 21 (S.D.N.Y.1974); *see also Zimmerman v. Bell*, 800 F.2d 386, 389 (4th Cir.1986).

Subsection (b)(2) authorizes a class action if

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed.R.Civ.P. 23(b)(2). "Subsection (b)(2) was never intended to cover cases like the instant one where the primary claim is for damages[. It] is only applicable where the relief sought is exclusively or predominantly injunctive or declaratory." *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 564 (2d Cir.1968) (citing Advisory Committee's Note, Proposed Rules of Civil Procedure, 39 F.R.D. 98, 102 (1965)). Accordingly, I find 23(b)(2) inapplicable to the case at bar.

### 2. 23(b)(3)

#### a. Introduction

Having found neither 23(b)(1) or 23(b)(2) applicable here, I may turn to 23(b)(3). Subsection (b)(3) authorizes a class action if

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3).

#### b. Superiority Over Other Methods

Plaintiff shows with little difficulty that the case at bar satisfies the latter element of subsection (b)(3). Plaintiff contends that "a class action is superior to other methods for the fair and efficient adjudication of this controversy because, absent a class action, this Court would be faced with the daunting task of litigating potentially hundreds or thousands of lawsuits." (Pl.'s Memo., Docket No. 62, at 9.) In addition, plaintiff indicates that the putative class members would be unlikely otherwise to receive relief. As explained above with respect to 23(b)(1), the incentives run strongly against the filing of individual lawsuits. Defendants do not contest these assertions by plaintiff and do not argue that a class action would not be superior.

For these reasons, I find that, in the circumstances of the case at bar, a class action is superior to other available methods for fair and efficient adjudication of the controversy. *See, e.g., Kirby*, 116 F.R.D. at 311 (" 'The benefits to the large number of class members, many of whose claims are so small that their size does not provide the impetus to bring individual actions, clearly outweigh any problems which may arise in the management of the class action. Economy will undoubtedly be achieved. Not only economy which will benefit members of the class, but economy which will benefit the judicial system as well.' ") (quoting *M. Berenson Co., Inc. v. Faneuil Hall*, 100 F.R.D. 468, 471 (D.Mass.1984)).

#### c. Predominance of Common Questions

##### i. Introduction

I have previously found that plaintiff satisfied Rule 23(a)(2), finding that common questions of law and fact exist. The issue before me now is whether the common questions predominate over any individual questions.

Individual questions do exist. As I explained earlier, this civil action requires proof that (1) defendants made a materially false or misleading statement or failed to state a fact necessary to make a statement not misleading; (2) in connection with the purchase or sale of a security; (3) with the intent to deceive, manipulate, or defraud; and that (4) class members were injured by their reasonable reliance on defendants' misrepresentations. *See Wortley*, 333 F.3d at 294. Though elements (1) through (3) present common questions, the matter of reliance is individualized. *See Gariety*, 368 F.3d at 362 ("[P]roof of reliance is generally individual-

ized to each plaintiff allegedly defrauded ....").

Ordinarily, questions of reliance in a securities fraud case will overwhelm the common questions of fact and law. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 242, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would ... prevent[ ] ... proceeding with a class action, since individual issues ... would ... overwhelm[ ] the common ones."); *Lehocky v. Tidel Techs.*, 220 F.R.D. 491, 504 (S.D.Tex. 2004) ("[I]n securities fraud litigation concerning section 10(b)/Rule 10b–5, section 20(a), and section 20A, the Plaintiffs must demonstrate that individual issues of reliance will not predominate."); *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) ("[A] fraud class action cannot be certified when individual reliance will be an issue."). Plaintiff thus must show that the individual questions do not predominate.

■ Lead plaintiff Thuma turns to the "fraud on the market" theory. When applicable, the "fraud on the market" theory obviates the need to show reliance. *See Baron v. Smith*, 285 F.Supp.2d 96, 103 (D.Mass.2003); *see also Basic*, 485 U.S. at 241–50, 108 S.Ct. 978. Rather, reliance is presumed, and the individual questions are no longer of concern.

■ According to the Supreme Court, to gain the benefit of the "fraud on the market" presumption a plaintiff must allege and prove:

> (1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the shares; and (5) that the plaintiff traded the shares between the time the misrepresentations were made and the time the truth was revealed.

*Basic*, 485 U.S. at 248 n. 27, 108 S.Ct. 978; *see also Freeman v. Laventhol & Horwath*, 915 F.2d 193, 198 (6th Cir.1990) (noting that *Basic* approved the above requirements).

The allegations in plaintiff's complaint speak to all of the required elements. De-

fendants contest element (3), however—that the relevant market was "efficient." Specifically, defendants assert that the market for PolyMedica common stock was "inefficient" from January 2001 to August 2001. As a result, defendants argue, the "fraud on the market" presumption may not be applied for that time period, and individual questions of reliance would predominate. They assert, therefore, that the class period must be shortened to exclude the year 2001. (*See* Tr. of June 2, 2004, Docket No. 91, at 26, 44.)

For reasons I will explain, I conclude that defendants' contention lacks merit. I find that the market was "efficient" during the contested time period and, accordingly, that the "fraud on the market" presumption of reliance may be applied during the entire proposed class period.

Defendants assert, however, that individual questions of reliance predominate even if the market was "efficient" and the "fraud on the market" theory accordingly applies to the entire class period. They contend that investors who sold PolyMedica stock *short* may not, in any circumstances, take advantage of the "fraud on the market" theory. It would follow that all short sellers within the proposed class would need to demonstrate individualized reliance. Defendants argue that the number of short sellers within the proposed class became large enough in the year 2001 for this court to find that individual questions predominate. Thus, defendants again contend that the class period must be shortened to exclude the year 2001. (*See id.* at 25–26, 39.)

For reasons I will explain, I conclude that this contention has some merit, but I also conclude that the appropriate response is not to shorten the class period. Rather, the appropriate remedy is to exclude short sellers from the class.

Defendants also contend that individual questions other than those of reliance exist, and that these individual questions predominate. Specifically, they assert that the process of selling share short creates "artificial" shares. (I explain this concept more thoroughly later.) They further contend that the holders of these "artificial" shares do not

have standing to bring suit. The resulting problem, according to defendants, is that the process of distinguishing these holders from those people with legitimate standing is a process rife with individual questions. Defendants argue that the number of these holders became large enough in the year 2001 for this court to find that these individual questions predominate. As a result, defendants argue, the class period must be shortened to exclude the year 2001. (*See id.* at 25–26, 39.)

For reasons I will explain, I conclude that this contention wholly lacks merit.

### 2ii. Requirement of "Efficient" Market

I turn first to the question of market "efficiency." According to defendants, the market for PolyMedica common stock was not "efficient" from January 2001 to August 2001. Plaintiff's response is that the market *was* "efficient." Both plaintiff and defendants offer expert reports in support of their respective positions. The dispute between the parties in fact is comprised of two parts. The parties first contest the meaning of "market efficiency." They then strive to show that the market was "efficient" or "inefficient." I address these issues serially.

Plaintiff asserts that "the essential factor in determining market efficiency is whether the stock price was affected by the material information available in the market." (Pl.'s Further Memo., Docket No. 87, at 5.) Defendants contend that plaintiff's definition is incomplete. They argue that, in an "efficient" market, the stock price not only is affected by material information in the market, but "the price of a security will reflect all the news about the company or industry available to the public." (Def.'s Surreply, Docket No. 82, at 5.) At this "so-called efficient price that reflects all available information," it is "no longer possible to generate arbitrage profits." (*Id.*) Defendants explain that "[a]n arbitrage opportunity exists when an investor can engage in a trade or series of trades that will *guarantee* him a profit." (Def.'s Opp., Docket No. 65, at 9–10.)

The "fraud on the market" theory was approved by a plurality of the Supreme Court (four justices out of the six who participated in the case) in *Basic, Inc. v. Levinson.* The First Circuit has yet to consider the meaning of "efficient" market in the context of the "fraud on the market" theory. (In fact, First Circuit case law regarding the "fraud on the market" theory in general is sparse.) I look to *Basic,* therefore, for the definition of "efficient" market.

The language in *Basic* supports plaintiff's understanding of "efficient" market and undermines defendants' assertion. In *Basic,* the Court did require that a market be "efficient" in order to apply the "fraud on the market" presumption. 485 U.S. at 248 n. 27, 108 S.Ct. 978. The Court also made several statements indicating that, for purposes of the "fraud on the market" presumption, it is not important that all information be incorporated rapidly or instantaneously into stock prices. For instance, consider the holding in *Basic:*

> The presumption is support by common sense and *probability*.... Because *most* publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action.

485 U.S. at 247, 108 S.Ct. 978 (emphasis added). Elsewhere in *Basic,* the Court stated the following:

> We need not determine by adjudication what economists and social scientists have debated through the use of sophisticated statistical analysis and the application of economic theory. For purposes of accepting the presumption of reliance in this case, we need only believe that market professionals *generally* consider *most* publicly announced material statements about companies, thereby *affecting* stock market prices.

*Id.* at 246 n. 24, 108 S.Ct. 978 (emphasis added). And in the following statement, the Court emphasized that no strict economic theory need be adopted by adjudication:

> [W]e do not intend conclusively to adopt any particular theory of how quickly and

completely publicly available information is reflected in market price.

*Id.* at 249 n. 9, 108 S.Ct. 978.

■■■ Considering the three statements together, I conclude that an "efficient" market in the context of the "fraud on the market" theory is *not* one in which a stock price rapidly reflects all publicly available material information. Rather, the "efficient" market required for "fraud on the market" presumption of reliance is simply one in which "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Id.* at 246 n. 24, 108 S.Ct. 978.

I note that this definition differs from the definition of an "efficient" market as an economic term of art. In fact, the academic economists' definition closely resembles defendants' definition. For example, one academic states that "the efficient capital market model ... posits that security prices fully reflect all available, relevant information." Roger J. Dennis, *Materiality and the Efficient Capital Market Model: A Recipe for the Total Mix,* 25 Wm. & Mary L.Rev. 373, 373 (1984). Two other leading academics in the field of market efficiency add the following:

> The common definition of market efficiency, that 'prices at any time 'fully reflect' all [']available information,' is really a shorthand for the empirical claim that 'available information' does not support profitable trading strategies or arbitrage opportunities.

Ronald J. Gilson & Reiner H. Kraakman, *The Mechanisms of Market Efficiency,* 70 Va. L.Rev. 549, 554–55 (1984) (citations omitted); *see also* Stephen A. Ross, *The Interrelations of Finance and Economics: Theoretical Perspectives,* Am. Econ. Rev., May 1987, at 29, 32 ("Intuition tells us that an efficient market is one where all of the publicly and cheaply available information is used by investors to determine the values at which securities trade in the market. This means that the prices should 'reflect' in some sense. It also means that an investor who simply makes use of this information should not be able to earn 'abnormal' profits by doing so.").

The difference does not change my definition. When legal precedent is available, I follow it, not economic or academic literature. And though the First Circuit has not issued an opinion on the matter, Supreme Court precedent exists. Furthermore, it is plain in *Basic* that the Court did not want to adopt the "economic" or "academic" definition of efficient market. As I quoted above, the Court explicitly stated, immediately after citing several academic articles, that

> *[w]e need not determine by adjudication what economists and social scientists have debated through the use of sophisticated statistical analysis and the application of economic theory.* For purposes of accepting the presumption of reliance in this case, *we need only believe* that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.

*Basic,* 485 U.S. at 246 n. 214, 108 S.Ct. 978 (emphasis added).

If any doubt exists as to the meaning of this statement, the dissent in *Basic* casts that doubt aside. The dissent warns against adopting economic theories, such as that of the "efficient" market. *See id.* at 254, 108 S.Ct. 978 (White, J., dissenting). Justice White acknowledged that the statement above was a response to his warning, intended to clarify that only "modest assumptions" need be made and that no full-blown economic theory was being or need be adopted. *Id.;* *see also* Donald C. Langevoort, *Theories, Assumptions, and Securities Regulation: Market Efficiency Revisited,* 140 U. Pa. L.Rev. 851, 893 (1992) (noting that Justice Blackmun "respond[ed] to the dissent's claim that he was prematurely writing a controversial economic theory (the efficiency hypothesis) into law"). Some commentators have suggested that the Court's "disclaimers" should be given no weight. *See, e.g.,* Jonathan R. Macey & Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud–on–the–Market Theory,* 42 Stan. L.Rev. 1059, 1077 (1990) ("Despite [the] disclaimer, the Court was adopting the semi-strong version of the efficient capital markets hypothesis, whether it was aware it was doing so or

not."). I reject such propositions; I will follow the plain meaning of a Supreme Court opinion unless that language has been *in fact* overruled or otherwise superceded, which are not the circumstances here.

I also note that the definition I have derived from *Basic* differs from much of the existing case law. Most cases define an "efficient" market as a market in which prices incorporate rapidly or promptly all publicly available information. *See, e.g., Freeman,* 915 F.2d at 198 ("An efficient market is one which rapidly reflects new information in price."); *Ross v. Bank South, N.A.,* 885 F.2d 723, 738 (11th Cir.1989) ("[M]ost courts now recognize that, in an efficient securities market, competing judgment of knowledgeable buyers and sellers cause the market to reflect an accurate price based on all available information."); *Cammer v. Bloom,* 711 F.Supp. 1264, 1276 n. 17 (D.N.J.1989) ("An efficient market is one which rapidly reflects new information in price." (internal quotation marks omitted)); *In re Bexar County Health Facility Dev. Corp. Secs. Litig.,* 130 F.R.D. 602, 606 (E.D.Pa.1990) ("The efficient capital market hypothesis states that the market's pricing mechanism will incorporate all relevant and material information into the market price of a security.") [hereinafter *In re Bexar*]. These cases, however, are not binding on this court.

Moreover, I do not find the reasoning in these cases persuasive. The courts in these cases did not consider or explain the language from *Basic* that I explained above. Rather, they seem to *assume* that *Basic* adopted whole cloth from economics the concept of an "efficient" market. Then, working from this assumption, the courts adopt from outside literature a definition of "efficient" market. *See, e.g., Cammer,* 711 F.Supp. at 1276 n. 17 (citing Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud (Aug.1988) for a definition of "efficient market"); *In re Bexar,* 130 F.R.D. at 606 (citing Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work,* 25 J. Fin. 282 (1970) for a definition of "efficient market"). Those courts that did not themselves look to economic literature adopted the definition of "efficient" market from

courts that did. *See, e.g., Freeman,* 915 F.2d at 198 (citing *Cammer,* 711 F.Supp. at 1276 n. 17, for a definition of "efficient market").

At least one federal judge and one commentator have recognized the failure of post-*Basic* courts to comprehend fully the language of *Basic. See In re Verifone Secs. Litig.,* 784 F.Supp. 1471, 1478 n. 7 (N.D.Cal. 1992) ("The Supreme Court's use of the term 'fair market price,' *Basic, Inc.,* 485 U.S. at 248, 108 S.Ct. at 992, may unfortunately and inaccurately suggest that application of the fraud-on-the-market theory requires proof that the market *correctly* reflects some 'fundamental value' of the security. *To apply the fraud-on-the-market theory, it is sufficient that the market for a security be 'efficient' only in the sense that market prices reflect the available information about the security."* (second emphasis added)); Nathaniel Carden, Comment, *Implications of the Private Securities Litigation Reform Act of 1995 for Judicial Presumptions of Market Efficiency,* 32 U. Chi. L.Rev. 879, 887 (1998) ("[D]espite the nearly universal acceptance of the proposition that the fraud-on-the-market theory and the [Efficient Capital Markets Hypothesis] are closely intertwined, a closer analysis of the efficiency requirement [in *Basic*] indicates that the ECMH plays a substantially smaller role than the post-*Basic* courts' language indicates.").

■ I now turn to a determination of whether the market was "efficient" during 2001. The issue is a question of fact, *see, e.g., In re Laser Arms Corp. Secs. Litig.,* 794 F.Supp. 475, 490 (S.D.N.Y.1989); *Simpson v. Specialty Retail Concepts,* 823 F.Supp. 353, 355 (M.D.N.C.1993), but, as I explained earlier, some findings must be made at the class certification stage.

The relevant question is whether the market for PolyMedica common stock is one in which "market professionals generally consider most publicly announced material statements about [PolyMedica], thereby affecting [the] stock market price[ ]." *Basic,* 485 U.S. at 246 n. 24, 108 S.Ct. 978. Direct evidence likely is difficult to acquire, but some more easily acquired facts might be useful as indirect evidence, including (1) the involvement of market professionals, (2) the degree to and

fluidity with which information is disseminated, and (3) whether information affected stock market prices. This list of factors is instructive, but not exhaustive.

Plaintiff has offered expert testimony that speaks directly to the facts suggested above.

(1) He provides empirical evidence showing a "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." (Pl.'s Reply Memo., Docket No. 76.) In particular, at five points in 2001 (the contested time period), PolyMedica stock price "rose [dramatically] on news of greater than expected growth and fell [dramatically] on negative news about the Company." (*Id.*) This evidence weighs strongly in favor of a finding that the market was "efficient" during the contested time period.

(2) He shows that the average weekly trading volume during the contested time period exceeded at all times 1,000,000 shares per week. (Weekly Trading Data, Exh. C to Docket No. 77, at 3–4.) During the proposed class period, PolyMedica had between 8,913,-476 and 13,284,804 shares outstanding. (Aff. of Alan Miller, Docket No. 77, ¶ 18.) The average weekly trading volume during the contested time period thus was around 10% of the shares outstanding. These numbers indicate active trading and imply significant investor interest. "Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F.Supp. at 1286. This evidence weighs strongly in favor of a finding that the market was "efficient" during the contested time period.

(3) Plaintiff provides evidence that eighteen different securities analysts followed PolyMedica during the Class Period. During the contested time period, at least four securities analysts issued at least seventeen analyst reports. These numbers may not seem high, but given that the contested time period spans only eight months, this evidence weighs somewhat in favor of a finding that the market was "efficient."

(4) Plaintiff shows that at least 283 market makers participated in the market for PolyMedica common stock during the proposed class period. (Aff. of Alan Miller, Docket No. 77, ¶ 19; Market Makers, Exh. D to Docket No. 77.) The evidence does not show specifically the level of market maker participation during the contested time period, however, which renders this evidence unhelpful in the current circumstances.

(5) Plaintiff offers evidence demonstrating that the market capitalization for PolyMedica Corporation exceeded $200,000,000 during the contested time period. (Aff. of Alan Miller, Docket No. 77, ¶ 22.) Like a high average weekly trading volume, this amount implies active trading, which implies significant investor interest, which implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information. This evidence weighs strongly in favor of a finding that the market was "efficient" during the contested time period.

Defendants do not contest any of these facts. Indeed, they do not contest that, during the contested time period, the market for PolyMedica common stock was one in which market professionals generally considered most publicly announced material statements about PolyMedica, thereby affecting the stock market price. They contend only that the market price did not fully and rapidly reflect all the publicly available material information. Their evidence also speaks only to that assertion. These contentions and evidence are not relevant to the definition of market "efficiency" that I have derived from *Basic*.

In these circumstances, I find that the market was "efficient" during the contested time period (between January 2001 and August 2001). Accordingly, I conclude that the "fraud on the market" presumption of reliance may be applied during the entire proposed class period.

### iii. Short Sellers and Fraud on the Market

▮ Defendants contend that individual issues of reliance nevertheless will predominate during 2001 because of the existence of a large number of short sellers. As a result, they argue, the class period must be short-

ened to exclude the year 2001. Defendants premise this contention on the assertion that short sellers may not rely on the "fraud on the market" presumption of reliance.

The premise to defendants' contention is correct. Short sellers may not rely on the "fraud on the market" presumption of reliance. The "fraud on the market" presumption is based on the idea that individuals relied on "the integrity of the market price." *Basic*, 485 U.S. at 247, 108 S.Ct. 978. Short sellers, however, sell short because they believe that the market price is somehow mistaken. An argument can be made that short sellers rely on the integrity of the *market,* but "[r]eliance on integrity of the *market* in a stock differs from reliance on the integrity of the market *price* in that stock." *Zlotnick v. TIE Communications,* 836 F.2d 818, 823 (3d Cir.1988). Accordingly, short sellers are not entitled to the "fraud on the market" presumption of reliance. *See id.* at 822–23.

I am not persuaded, however, that the class period must be or should be shortened to exclude the year 2001. Defendants' suggestion requires this court to determine when exactly the number of short sellers was so great that their individual issues of reliance would overwhelm the questions common to the class. Plaintiff suggests that short sellers may simply be excluded from the class. This suggestion seems to be the more appropriate solution.

This is not to say that defendants are incorrect in suggesting that the presence of a few short sellers would not bar class certification whereas the presence of many short sellers would. At some point, a difference in degree does become a difference in kind. Indeed, some courts have certified classes that include a few short sellers. *See Weikel v. Tower Semiconductor Ltd.,* 183 F.R.D. 377 (D.N.J.1998). I believe the latter alternative is more appropriate only because, in the circumstances of this case, it does not require a potentially arbitrary decision by this court.

Defendants object to plaintiff's suggestion, contending that the process of excluding short sellers presents innumerable individual questions of fact. This objection lacks merit. The exclusion of short sellers is a matter of class administration that other courts have

concluded can be surmounted. *See Ganesh, L.L.C. v. Computer Learning Ctrs.,* 183 F.R.D. 487, 492 (E.D.Va.1998) ("[A] class that excluded those who participated in short-sale transactions could foreseeably satisfy the requirements of Rules 23(a) and 23(b)(3)."); *Dorchester Investors v. Peak Trends Trust,* No. 99 Civ. 4696, 2002 WL 272404, at *6 n. 6 (S.D.N.Y. Feb. 26, 2002) (unpublished decision) (certifying a class despite argument by defendants "that . . . neither those who sell short nor those who knew about the short selling scheme can be readily identified"). I do not pretend that the identification of short sellers will not require work, but class administration is a process that invariably requires work. Moreover, I am certain that the identification of short sellers is a problem for which able counsel can develop an efficient solution, especially if compelled to do so by a decision of this court.

Accordingly, I conclude that the appropriate remedy to defendants' contention is to exclude those who participated in short-sale transactions from the class. I have phrased this exclusion carefully to exclude not only those engaged exclusively in short-sale transactions, but those who may have sold short and long. I do so because I am persuaded that the task of wholly excluding individuals is surmountable, whereas the task of determining whether individuals may proceed on certain transactions and not on others likely is, in a word, herculean.

### iv. "Artificial Shares"

Defendants also assert that individual questions other than those of reliance exist. In particular, they advance a notion they call "artificial shares." A short-sale transaction occurs in two steps: (1) a short seller borrows stock and sells it to an investor; and (2) the short seller purchases stock to return the stock she borrowed (she "covers" her short). (Def.'s Opp., Docket No. 65, at 17.) "Artificial shares," defendants contend, are a result of the first step. In the first step, the short seller ordinarily borrows stock from a brokerage firm. (*Id.*) The stock that the brokerage firm lends belongs to a customer of the brokerage firm. (*Id.*) The brokerage

firm does not keep track of whose stock is lent out, because the stock is lent out of a pool of customer shares. (*Id.*) The problem, defendants suggest, arises when the stock is loaned to a short seller and then sold by the short seller to an investor. Two people now "own" the same shares—(1) the customer of the brokerage firm whose shares were lent to a short seller, and (2) the investor who purchased the lent shares from the short seller. (Def.'s Opp., Docket No. 65, at 18.) According to defendants, an "artificial share" has been created.

Brokerage firms have contracts with their customers that govern the lending of customer shares to short sellers. (*Id.*) In the ordinary course, these contracts specify that the customer whose stock is lent loses certain rights in the stock, including the right to vote the share. (*Id.*) The investor who purchased the lent stock from the short seller obtains these rights. (*Id.*) Defendants contend that it is the brokerage firm customer (the shareholder whose stock was "lent") who has the "artificial share," by virtue of the fact that she has lost certain rights in the stock.

Ultimately, defendants argue that the person with an "artificial share" does not have standing to bring suit. As a result, they contend, those proposed class members who had "artificial shares" will need to be distinguished from those who did not. They assert that this process will create overwhelming individualized questions.

 Defendants' contention is wholly without merit. It is premised on an inaccurate concept of standing for securities fraud cases. Standing in a securities fraud case such as this one is limited simply to "purchasers or sellers of securities." *In re Oxford Health Plans, Inc. Secs. Litig.*, 199 F.R.D. 119, 122 (S.D.N.Y.2001). The goal in this limitation is to prevent litigation by "bystanders, who, having risked nothing, would claim that they would have bought or sold securities but for the fraud." *Haber v. Kobrin*, No. 82 Civ. 3715, 1983 WL 1332, at *3 (S.D.N.Y. June 3, 1983). Those proposed class members who had "artificial shares" were nevertheless purchasers in the strictest sense of the word. They are not, in any way, the "bystanders" that should be excluded from bringing suit. Standing in a securities fraud case is not contingent on the rights a person has in a security. In fact, it has been held that an entity that entered into a contract for securities had standing to sue as a "purchaser" even though the other party to the contract never had the securities to transfer. *See First Nat'l Bank of Chicago v. Shearson Lehman Brothers, Inc.*, No. 85 C 4266, 1989 WL 165009, at *5 (N.D.Ill.Dec.20, 1989).

Accordingly, no separation of proposed class members will be necessary and individual questions of fact do not arise.

### d. Conclusion

In the foregoing analysis of the Rule 23(b)(3) requirements, I have found that plaintiff easily satisfies the superiority element of Rule 23(b)(3). I have also found that common questions predominate over individual questions if the class is redefined to exclude those who participated in short-sale transactions. Accordingly, subject to the redefinition of the class, I find that the proposed class satisfies the requirements of Rule 23(b)(3).

## D. Certification and Notice

Lead plaintiff Thuma has carried his burden regarding Rules 23(a) and 23(b)(3), subject to the redefinition of the class described above. Accordingly, I allow his motion for certification and certify the class in the Order below.

Rule 23(c)(2)(B) requires this court to "direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R.Civ.P. Rule 23(c). Counsel for plaintiffs shall submit a draft of their proposed form of notice to the court and all opposing parties within fourteen days of the filing of this Memorandum and Order of Certification. Any objections to the proposed notice shall be filed fourteen days after receipt of the proposed form of notice.

## ORDER OF CERTIFICATION and PRACTICE AND PROCEDURE ORDER NO. 4

For the foregoing reasons, it is OR-DERED:

(1) Lead Plaintiff's Motion for Class Certification (Docket No. 61) is ALLOWED.

(2) Until further order of this or a higher court, this action may be maintained as a class action under Fed.R.Civ.P. 23(a) and 23(b)(3), subject to the terms and conditions set forth below.

(3) The Class is hereby certified, consisting of:

Persons who:

(1) purchased PolyMedica Corporation common stock from October 26, 1998 through August 21, 2001, inclusive, but did not do so to cover a short-sale transaction of PolyMedica Corporation common stock AND

(2) did not engage in a short-sale transaction of PolyMedica Corporation common stock from October 26, 1998 through August 21, 2001.

(4) Lead plaintiff Thomas Thuma in the consolidated actions currently before the court is certified as the representative of the class.

(5) Counsel for plaintiffs are directed to submit a draft of their proposed form of notice to the court and all opposing parties within fourteen days of the date of this Memorandum and Order of Certification. Any objections to the proposed notice shall be filed fourteen days after receipt of the proposed form of notice.

(6) A **case management conference** is set for **Thursday, October 7, 2004 at 2:30 p.m.**