**Terry SWACK, individually and on behalf of all others similarly situated, Plaintiffs,**

**v.**

**CREDIT SUISSE FIRST BOSTON, Elliott Rogers,[1] and Mark Wolfenberger, Defendants.**

**No. Civ.A. 02–11943–DPW.**

United States District Court, D. Massachusetts.

Sept. 14, 2005.

---

1. Pursuant to my order of September 21, 2004, the motion by defendant Elliott Rogers to dismiss the claim against him for "control person" liability under § 20(a) of the Securities Exchange Act of 1934 was granted. *See Swack v. Credit Suisse First Boston,* 383 F.Supp.2d 223, 246–47 (D.Mass.2004). In her complaint, plaintiff Swack failed to allege that Rogers actually exercised control over Wolfenberger regarding the contents of Wolfenberger's Razorfish-related research reports and communications, thereby failing to adequately plead a § 20(a) claim against Rogers. *Id.*

Theodore M. Hess–Mahan, Edward F. Haber, Thomas G. Shapiro, Shapiro, Haber & Urmy, LLP, Boston, MA, for Plaintiffs.

Sandra S. McQuay, Sullivan, Weinstein & McQuay, P.C., Boston, MA, for Defendants.

*MEMORANDUM AND ORDER*

WOODLOCK, District Judge.

In this putative class action litigation, plaintiff Terry Swack ("Swack") alleges that defendants Credit Suisse First Boston LLC ("CSFB") and its analyst Mark Wolfenberger ("Wolfenberger") (collectively, the "Defendants") violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as well as Securities and Exchange Commission Rule 10–b, by issuing intentionally false and misleading research reports regarding Razorfish, Inc. ("Razorfish"). Specifically, Swack alleges that the Defendants issued overly optimistic reports regarding Razorfish in order to generate additional income for CSFB through the investment banking services it provided to Razorfish, as well as additional bonuses for Wolfenberger, compensation that was linked to CSFB's investment banking fees as per the instruction of CSFB management. Swack further alleges that these false and misleading research reports had the effect of artificially inflating the value of Razorfish stock for a period of time, and that she and the other class members were injured when the price of the stock thereafter deflated.

Swack, who has previously been appointed Lead Plaintiff for the putative class,[2] now moves the Court to certify a class of plaintiffs comprising all those individuals and entities who purchased Razorfish common stock between May 24, 1999 and May 4, 2001, inclusive (the "Class Period"). The Defendants oppose the motion, arguing that various of the requirements for certification under Fed.R.Civ.P. 23 have not been met. In particular, the Defendants contend that Swack, who purchased her stock directly from the issuer as part of a merger and who had the opportunity to question Razorfish executives personally, is not a typical plaintiff and cannot adequately represent a class of those who for the most part purchased their shares in the market.

**2.** By order entered April 3, 2003, I appointed Swack as Lead Plaintiff and Shapiro Haber & Urmy LLP as Lead Counsel, and consolidated three related actions.

**3.** This statement of facts regarding CSFB's coverage of Razorfish and the Massachusetts, SEC,

After extended consideration, I am satisfied that a functional analysis of Swack's posture in this litigation justifies appointing her to be class representative for all of the class-wide issues. *See* Section II.B.2. below for a list of some of the common questions of law and fact. It is only when, if ever, the question of individual damages is addressed that the limitations to proceeding with her—or any other individual plaintiff, for that matter—as class representative will become material. There will be time enough at that point in the litigation to revisit the question of class litigation. I make this decision recognizing that some of the case law has declined to permit a plaintiff in Swack's circumstances to act as class representative in fraud-on-the-market securities litigation such as this. I find, however, that these cases treated the issue in a mechanical fashion, ignoring the true purpose of the typicality inquiry.

## I. BACKGROUND

### A. Factual History[3]

#### 1. *Relationship Between Razorfish and CSFB*

The CSFB Global Technology Group ("CSFB Tech Group" or "Tech Group"), which housed both research analysts and investment banking sales personnel, was the lead manager for Razorfish's Initial Public Offering ("IPO") on April 27, 1999. Compl. ¶ 63. Thereafter, the CSFB Tech Group continued to manage a substantial portion of Razorfish's investment banking business. *Id.* CSFB research analyst Wolfenberger initiated CSFB's research coverage of Razorfish stock on May 24, 1999 with a "buy" rating. *Id.* ¶ 64. Wolfenberger reiterated the "buy" rating in subsequent research reports issued in June and July 1999. *Id.* ¶ 65. In October 1999, CSFB and Razorfish discussed a secondary stock offering by Razorfish, and CSFB acted as an investment bank-

and NASD complaints against CSFB are drawn primarily from my September 21, 2004 Memorandum and Order. Citations to the Complaint ("Compl.") refer to the "Second Consolidated Amended Class Action Complaint" filed in this putative class action lawsuit.

er advising Razorfish on the acquisition of International Integration Incorporated ("i-Cube") in exchange for Razorfish stock. *Id.* ¶ 66.

In subsequent months, numerous e-mail exchanges between Wolfenberger and Razorfish CEO Jeff Dachis ("Dachis") suggest close coordination on research reports between the producer and the subject of the reports in order to boost Razorfish's stock price. For example, on October 29, 1999, Wolfenberger sent an e-mail to Dachis concerning re-initiation of coverage of Razorfish in which he stated:

> I want your opinion on rating. We would have taken you to a strong buy but given the recent stock run, does it make sense for us to keep the upgrade in our back pocket in case we need it? Either way I don't care. You guys deserve it, I just don't want to waste it.

*Id.* ¶ 76. Dachis responded by e-mail asking Wolfenberger to "re-initiate with a buy and a higher price target and keep the upgrade for a little while." *Id.* ¶ 77 (adding "[a]lthough its [sic] getting hard to justify the valuations"). In this same message, Dachis also stated: "[G]et the secondary out above 100, and see how it goes ... what do you think?" *Id.* ¶ 81. On November 3, 1999 Wolfenberger issued a research report raising Razorfish's rating to "strong buy." *Id.* ¶ 78.

On December 2, 1999, Wolfenberger issued another report rating Razorfish as a "strong buy." *Id.* ¶ 68. In January 2000, the price of Razorfish stock began to decline. *Id.* Nevertheless, Wolfenberger issued "strong buy" ratings for Razorfish from January 2000 through May 2000 and set optimistic price targets for the stock. *Id.* During this time period, CSFB publicly maintained that its Tech Group was the "largest, most credible and insightful team on Wall Street" and that its members were encouraged "to interpret [industry] information in a fair and objective manner." *Id.* ¶ 47.

On March 3, 2000—a day on which Wolfenberger issued another "strong buy" report for Razorfish—he sent an e-mail to Dachis proposing a joint plan to boost Razorfish's price: "We'll work the phones, you work the road show." *Id.* ¶ 86. Later that same day, Wolfenberger sent another e-mail to Dachis explaining that "[w]ith the call we made and

the market and you on the road, this stock should be higher than $5." *Id.* ¶ 87. As on many—although not a majority—of the dates on which Wolfenberger issued his positive research reports, Razorfish's stock price increased: the stock rose more than 11% for the day, well above the NASDAQ's overall increase of 3.4%. *Id.* ¶ 86.

On June 14, 2000, Wolfenberger e-mailed Dachis to say "I'd like to do a note before the quiet period to try and move the stock." *Id.* ¶ 88. He sent further e-mails in July 2000 explaining how he was "[w]orking the stock" in the Midwest. *Id.* ¶ 89. In the summer and fall of 2000, Wolfenberger continued to issue "strong buy" ratings for Razorfish. Dachis was grateful for this effort, writing in an e-mail "You da man ... I won't forget this effort ... thank you." *Id.* ¶ 94. Later, in response to a report forwarded to him, Dachis thanked Wolfenberger by e-mail for the fact that Razorfish—along with many other companies—maintained its "strong buy" rating while several other "information technology service companies" had been downgraded.

On October 6, 2000, Wolfenberger issued a report rating Razorfish a "strong buy" and set a price target of $15 per share, even though the stock was then trading at $8.75 per share. *Id.* ¶ 98. Dachis thanked Wolfenberger by e-mail that morning, writing "again you da man, we appreciate the continued support." *Id.* On October 27, 2000, when Razorfish was trading at $4 per share, Wolfenberger finally lowered his rating to "buy." *Id.* ¶ 79. Through the winter of 2000–01, Wolfenberger continued to rate Razorfish a "buy" and set target prices substantially higher than those set by other research analysts.

On March 20, 2001, Wolfenberger sent an internal CSFB e-mail in which he stated: "I think there is a risk of bankruptcy ... best case is dead money. Could be acquired but hard to call. Would consider reducing exposure." *Id.* ¶ 101. On March 21, 2001, another CSFB analyst sent an e-mail to Elliott Rogers recounting that Wolfenberger had stated that most of his IPOs should never have gone public, that the companies subsequently had collapsed due to structural prob-

lems, but that, nevertheless, "we all got our bonuses for a good year." *Id.* ¶ 52.

CSFB maintained its "buy" rating and $5 price target for Razorfish until May 4, 2001, when Razorfish was trading at only $1.14 per share and Wolfenberger finally reduced the rating to "hold." *Id.* ¶ 73.

### 2. The Massachusetts, SEC, and NASD Complaints

On September 12, 2002, Reuters News Service reported that Massachusetts securities regulators had been investigating whether reports by CSFB research analysts had been tainted by the firm's desire to obtain investment banking business from the com-

panies it covered. The article stated that CSFB analysts "may routinely have received compensation that was linked to specific investment banking transactions." [4] Compl. ¶ 21. On April 28, 2003, the Securities and Exchange Commission ("SEC"), based on an independent investigation, filed a complaint (the "SEC Complaint") against CSFB in the United States District Court for the Southern District of New York, alleging violations of federal securities laws.[5] *Id.* ¶ 24. CSFB entered into multimillion dollar consent decrees to settle both the Massachusetts and SEC Complaints. *Id.* ¶ 28.

On March 6, 2003, the National Association of Securities Dealers ("NASD") filed a complaint ("NASD Complaint") against Frank

4. On October 21, 2002 the Massachusetts Securities Division's Enforcement Section filed an Administrative Complaint (the "Massachusetts Complaint") against CSFB alleging in part:

> [CSFB Tech Group] [a]nalysts disseminated biased, subjective, and compromised research favorable to CSFB investment banking clients, which resulted in the Tech Group producing millions of dollars in investment banking fees for CSFB. CSFB purposely misled investors by disseminating into the marketplace fraudulent misstatements of fact concerning the companies covered by the analysts. Moreover, CSFB failed to disclose any of the analysts' conflicts of interest to investors.

Compl. ¶ 23.

The Massachusetts Complaint alleged that explicitly or implicitly, CSFB analysts were instructed that their primary objective was not to provide objective, unbiased advice concerning the stocks they covered, but rather to increase investment banking revenue. Investment bankers could control hiring, firing, promotion, and bonuses paid to analysts, which were based largely on the analyst's willingness and ability to provide research reports that would boost the covered company's stock price. Technology research coverage, purportedly issued for the guidance of investors, was instead used to attract and retain investment banking business. *Id.* ¶¶ 33–45.

According to the Massachusetts Complaint, Tech Group investment bankers imposed an unwritten rule on analysts that "if you can't say something positive [about a company], don't say anything at all." *Id.* ¶ 44. On May 30, 2001, one analyst (not alleged to be Wolfenberger) wrote this rule in an e-mail and forwarded it to Elliott Rogers. According to the Massachusetts Complaint, the analyst was then summoned to meet with CSFB's General Counsel, who "told the analyst to delete all copies of the e-mail because he would hate to see [it] appear in the [Wall Street] Journal." *Id.* ¶ 45.

The Massachusetts Complaint concluded that CSFB used its research to fraudulently benefit its investment bank business:

> CSFB touted 'independent research' and instead used its research to market its investment banking business.... This was hidden from the public, who relied on the research information. Thus, CSFB perpetrated fraud by the disseminated material misstatements of facts into the marketplace.

*Id.* ¶ 46.

5. The SEC Complaint alleged that from 1998 through December 2001, CSFB used its research analysts to "solicit and conduct" investment banking business with potential investment banking clients. Compl. ¶ 24. It alleged that research analysts were compensated mainly on their contribution to CSFB investment banking deals, and cited an e-mail from Frank Quattrone, the manager of the Tech Group, to its analysts requesting that they "submit a list of banking deals in which you participated in a lead or supporting role" in order for the management team to determine analyst compensation. *Id.* ¶ 51. According to the SEC, analysts were involved in CSFB's investment banking business as early as the sales pitch to a prospective new client. In a "pitch book" presented to one company, CSFB "highlighted that its research analysts maintained a 'strong buy' rating even though the company announced results below estimates." *Id.* ¶ 61. This pitch book included a page titled "CSFB Stands by its Clients," in which it contrasted its own record of providing "strong buy" ratings for IPO clients despite disappointing earnings announcements with competitors' lower (apparently more honest) ratings. *Id.* ¶ 62. CSFB "implied through this pitch book that the firm would provide positive research if awarded the investment banking business." *Id.* ¶ 61.

Quattrone in his role as manager of CSFB's Tech Group.[6] *Id.* ¶ 107. In January 2002, CSFB settled "spinning" (*i.e.*, improperly using the allocation of IPO shares to win investment banking business) charges with the NASD and SEC for $100 million. *Id.* ¶ 114.

### 3. Swack's Acquisition of Razorfish Stock

Lead Plaintiff Swack acquired 90,000 shares [7] of Razorfish common stock on December 1, 1999, a date that falls within the proposed Class Period. Swack received her shares of Razorfish stock as part of the compensation package for the merger of TSDesign, a design company of which she was the founder and sole shareholder, with Razorfish. That deal consummated on December 1, 1999. Swack Dep. 26:5–16; 30:11–13; 100:20–24.[8] In the course of the due diligence conducted by both Swack and Razorfish prior to the merger—as well as preparations during the pre-sale period for the subsequent integration of TSDesign into Razorfish—Swack had the opportunity to meet personally with various Razorfish executives including, *inter alia*, the Chief Executive Office/Founder, the Chief Financial Officer, the Chief Science Officer/Founder, and the sales manager for North America. Swack Dep. 46:1–6; 51:25–52:1–9; 53:1–25, 54:1; 55:20–25, 56:1–25; 57:1–23.

Swack had retained a mergers and acquisitions adviser, Eric Shealy ("Shealy"), to assist her in her effort to sell TSDesign. Swack Dep. 76:10–17. Regarding an offer by Razorfish to Swack comprising 80,000 shares of Razorfish stock, $500,000 in options for Swack, and a $500,000 bonus to be divided among the other TSDesign employees, Shealy advised Swack to value the Razorfish

shares at $44 per share, rather than the $63 per share at which they were then trading, because of, as he put it in a parenthetical, a "30% discount to market." Swack Dep. Ex. 2. The final offer by Razorfish to Swack included 90,000 shares of Razorfish stock with no share price floor, meaning that Swack would receive the same number of shares despite any changes in the value of the stock during the interval before the deal formally closed. Swack Dep. 100:20–24. Swack agreed to these terms on November 30, 1999, but the merger agreement was not enforceable until it was signed by Swack at the closing on December 1, 1999.

Razorfish announced its acquisition of TSDesign—as well as its purchase of two other companies—on December 1, 1999 after the market closed. Swack Dep. 110:13–18. Swack was given advance notice by Razorfish that on December 2, 1999 it would also be announcing one or two other acquisitions in addition to TSDesign, but she did not learn the nature or size of the companies being acquired until the deals were announced publicly. Swack Dep. 113:20–25, 114:1–10. On December 2, 1999, the day after the three acquisitions were announced, Razorfish stock opened 8.8% over its December 1st closing price.

Pursuant to the terms of the merger agreement between TSDesign and Razorfish, Swack became an executive employee of Razorfish. Swack Dep. 110:16–20. Her job title was Vice President of Experience Design, a role she described as being a "change agent." Swack Dep. 119:5–14. Although the merger agreement provided for Swack to serve in this capacity for a period of three years, she left the company—by mutual

---

**6.** The NASD Complaint alleged much the same misconduct as the Massachusetts and SEC Complaints:

> The Tech Group sought to induce issuers to become investment banking clients ... by holding out the prospect of CSFB's issuing favorable research about them.... Quattrone created a powerful incentive for the analysts to initiate and maintain favorable coverage on investment banking clients by linking their annual bonuses—which sometimes amounted to $10 million or more and represented far and away the largest part of their compensation— to investment banking revenues generated by the Tech Group.... Quattrone encouraged investment bankers to participate in the re-

search analysts' annual performance evaluations and supported the investment bankers' efforts to pressure analysts into initiating and maintaining coverage of investment banking clients.... All of these practices compromised the independence and objectivity of the Tech Group's analysts.

*Id.* ¶ 109–111.

**7.** Pursuant to a subsequent stock split, Swack later held 180,000 shares of the stock.

**8.** All references to "Swack Dep." refer to the transcript of, and the exhibits to, the deposition of Lead Plaintiff Terry Swack conducted on January 11, 2005.

agreement with Razorfish—after approximately eleven months. Swack Dep. 128:21–23.

Swack sold 50,000 of her 180,000 post-split Razorfish shares on January 12, 2001, the earliest date after her shares became unrestricted and she completed the paperwork necessary for her to be permitted to sell them.[9] Swack Dep. 135:7–20. Swack sold an additional 70,000 shares on March 30, 2001, 15,000 shares each on July 26, 2001 and July 27, 2001, and her final 30,000 shares on March 13, 2002. Swack Dep. 137:16–20; 139:14–17; 140:5–8.

### B. Procedural History

Swack filed the original complaint in this case on October 3, 2002 and a Second Consolidated Amended Complaint on October 20, 2003. In the meantime, by order dated April 3, 2003, a related, pending action—*Chuw v. Credit Suisse First Boston*, 02–CV–12166–DPW—was consolidated with the present case, and I directed that any other related actions then pending or thereafter filed in the District of Massachusetts be consolidated

9. Because Swack had acquired her Razorfish shares directly from the issuer, the shares were "restricted securities" within the meaning of SEC regulations and therefore subject to a one-year holding period. *See* 17 C.F.R. § 230.144(a)(3)(i) (2002) (defining "restricted securities" as "[s]ecurities acquired directly or indirectly from the issuer ... in a transaction or chain of transactions not involving any public offering)"; 17 C.F.R. § 230.144(d)(1) (providing that restricted securities cannot be resold during the first year after which they were acquired); *see also* 17 C.F.R. § 230.144(h) (requiring a holder of restricted securities to file notice of proposed sale with the SEC and other designated entities before selling more than 500 shares of such securities within a three-month period).

10. *Pelland v. Credit Suisse First Boston*, 03–CV–11722–DPW, which was originally filed in the Southern District of New York, was transferred to this Court on September 8, 2003. Pursuant to the April 3, 2003 order, the case was thereafter consolidated with the present action.

11. Regarding the appointment of a Lead Plaintiff, the statute provides, in relevant part:

> the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that—(aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i); (bb) in the determination of the court, has the largest financial interest in the relief sought by the

with the present case.[10] Additionally, pursuant to §§ 21D(a)(3)(B)(iii) and 21D(a)(3)(B)(v) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act ("PSLRA"), I approved Swack's motion for appointment as Lead Plaintiff and her selection of the law firm of Shapiro, Haber & Urmy LLP as Lead Counsel.[11]

## II. DISCUSSION

### A. Class Certification Generally

The hurdles that Swack must clear in order for the class she proposes to be certified are familiar ones: the four prerequisites of Fed.R.Civ.P. 23(a)[12]—numerosity, commonality, typicality, and adequacy—as well as certain requirements established by Rule 23(b). *See Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 38 (1st Cir. 2003) (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). In this case, Swack is seeking class certification under Rule 23(b)(3) and must therefore meet the "predominance" and "superiority" requirements.[13]

class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.
Securities Exchange Act of 1934, § 21D(a)(3)(B)(iii), as amended, 15 U.S.C. § 78u–4(a)(3)(B)(iii) (2005). With respect to the selection of Lead Counsel, the statute provides that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." *Id.* at § 21D(a)(3)(B)(v), as amended, 15 U.S.C. § 78u–4(a)(3)(B)(v) (2005).

12. Fed.R.Civ.P. 23(a) sets forth the prerequisites to a class action as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

13. The "predominance" and "superiority" requirements of Fed.R.Civ.P. 23(b)(3) conditions the maintenance of a class action upon findings that:

> questions of law or fact common to the members of the law predominate over any questions affecting only individual members, and that a

The plaintiff shoulders the burden of establishing the necessary Rule 23 requisites. *See Smilow,* 323 F.3d at 38 ("[t]o obtain class certification, the plaintiff must establish the four elements of Rule 23(a) and one of several elements of Rule 23(b)."); *In re Eaton Vance Corp. Securities Litig.,* 219 F.R.D. 38, 43 (D.Mass.2003) (holding that "[i]t is ultimately the named plaintiffs who bear the burden of establishing that class certification is appropriate."); *Guckenberger v. Boston Univ.,* 957 F.Supp. 306, 325 (D.Mass.1997) (stating that "[t]he moving party has the burden of demonstrating that all of the prerequisites to certification under Rule 23(a) and 23(b) have been met.").

Although class certification determinations should not entail "mini-trials" on the merits of the plaintiff's claims, *Unger v. Amedisys Inc.,* 401 F.3d 316, 321 (5th Cir.2005), courts must engage in a "rigorous analysis of the prerequisites established by Rule 23 before certifying a class," *Smilow,* 323 F.3d at 38, and exercise their "power to test disputed premises early on if and when the class action would be proper on one premise but not another." *Tardiff v. Knox County,* 365 F.3d 1, 4–5 (1st Cir.2004). In so doing, "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *General Telephone Co. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). There is split authority, however, as to what extent courts may examine the merits of the plaintiffs' claims and make factual inquiries at the class certification stage.[14] Despite this discord, all of the courts seem to agree that whatever the inquiry, it may only go so far as necessary to resolve the questions raised by the Rule 23 requirements. After reviewing the case law, submissions by the parties and a recent article by Professor Mullenix,[15] I concur with Judge Keeton who recently observed in a securities case that while "[t]he First Circuit has not addressed the issue squarely, ... it appears to favor a more searching inquiry." *In re Polymedica Corp. Securities Litig.,* 224 F.R.D. 27, 35 (D.Mass. 2004). As a result, for present purposes, I have assessed the allegations in the complaint in light of the entire record presented to me on the motion for class certification. Consequently, while the plaintiffs' allegations and expert opinions will be given considerable weight and will benefit from reasonable inferences, my conclusions are informed by the record submissions of the defendants as well.

In approaching the class certification analysis, I bear in mind the underlying purposes of class certification both generally and in the context of securities litigation specifically. *See Smilow,* 323 F.3d at 41 ("The core purpose of Rule 23(b)(3) is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation.") (citing with approval *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7th Cir.1997) ("A class action solves this problem [*i.e.,* small recoveries not providing an incentive for an individual to file suit] by aggregating the relatively paltry po-

class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or questions of law or fact common to the members of the class undesirability of concentrating the litigation of the claims in a particular forum; (D) the difficulties likely to be encountered in the management of a class action.

**14.** The Second Circuit, for instance, does not permit its district courts to look further than the allegations presented in the complaint. See *Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 291–93 (2d Cir.1999). The Third, Fourth, and Seventh Circuits, on the other hand, "require a district court to make factual and legal inquiries beyond the allegations in the complaint if such inquiries are necessary to an informed ruling on class certification." *In re Polymedica Corp. Securities Litig.,* 224 F.R.D. 27, 35 (D.Mass. 2004). *But see Payne v. Goodyear Tire & Rubber Co.,* 216 F.R.D. 21, 24 (D.Mass.2003) (citing *Eisen v. Carlisle,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) for the proposition that the class certification decision " 'does not involve an examination of the merits of the underlying dispute' and, therefore, that the allegations of the plaintiff would be treated as true for purposes of the certification analysis.)".

**15.** Linda S. Mullenix, *Taking Adequacy Seriously: The Inadequate Assessment of Adequacy in Litigation and Settlement Classes,* Vanderbilt L.Rev. 1687 (2004).

tential recoveries into something worth someone's (usually an attorney's) labor.")); *Priest v. Zayre*, 118 F.R.D. 552, 554–55 (D.Mass.1988) (determining that "[c]ourts have expressed a general preference for class certification in securities fraud cases based on a policy favoring enforcement of the federal securities laws and recognition of the fact that class actions may be the only practicable means of enforcing investors' rights.") (internal citations omitted).

I also, of course, consider the policies underlying the PLSRA—Congress' response to perceived abuses in securities fraud litigation. *See In re Galileo Corp. Shareholders Litig.*, 127 F.Supp.2d 251, 260 (D.Mass.2001) (internal citations omitted) (explaining that the PLSRA was enacted "in a bipartisan effort to curb abuse in private securities litigation, especially the filing of so-called strike suits. In particular, Congress sought to reform private securities litigation to discourage unmeritorious class actions, including actions brought because of a decline in stock prices" and listing as among the three aims of the statute "to empower investors so that they—not their lawyers—exercise primary control over private securities litigation."). Throughout this analysis, the Rule 23 requirements remain the touchstone.

## B. Rule 23(a) Requirements [16]

### 1. *Numerosity*

■ The numerosity requirement of Rule 23(a) is satisfied when the class is "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). As noted above, Swack seeks to represent a class comprising "all persons or entities who purchased shares of Razorfish during the Class Period and who were damaged thereby." [17] Compl. ¶ 13. Although the precise number of potential class members is not yet known, this does not doom the claim. "[T]he party instituting the action need not show the exact number of potential members in order to satisfy" the numerosity prerequisite, but she "does bear the burden of showing impracticability and mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)." 7A Wright, Miller & Kane, Federal Practice and Procedure § 1762 (2004). Thus, Swack must make reference to some factual basis tending to demonstrate the impracticability of joinder.

Swack correctly cites First Circuit precedent for the proposition that "courts may draw reasonable inferences from the facts presented to find the requisite numerosity." *McCuin v. Secretary of Health and Human Services*, 817 F.2d 161, 167 (1st Cir.1987), but she provides scant subsidiary facts from which such inferences could be drawn. The sum total of Swack's factual allegations on this point is as follows:

> While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States. Throughout the Class Period, shares of common stock of Razorfish were actively traded in an efficient market on the NASDQ National Market System.

Compl. ¶ 14. Swack alleges neither how many shares of stock were outstanding nor what the average daily trading volume was during the Class Period, both factors commonly considered by courts when finding the numerosity prong satisfied despite the absence of specific information about the number of individuals who purchased the stock during the relevant period. *See In re PolyMedica*, 224 F.R.D. at 35 (in securities

---

**16.** Although the Defendants do not challenge Swack on the numerosity and commonality prerequisites for certification under Rule 23(a), I read the instruction from the First Circuit in *Smilow*, 323 F.3d at 38 that "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class," to require analysis of all requisite elements, whether subject to challenge or not. *See McLaughlin v. Liberty Mutual Ins. Co.*, 224 F.R.D. 304, 307 (D.Mass.2004) (analyzing all relevant Rule 23 requirements even though defen-

dant challenged only a subset thereof). Consequently, I will take up each of the threshold requirements presented by Fed.R.Civ.P. 23(a).

**17.** The Complaint excludes the following persons and entities from the definition of the Class: "Defendants; members of the Individual Defendants' immediate families, any director, officer, parent, subsidiary, or affiliate of CSFB; any entity in which any excluded person has a controlling interest; and their legal representatives, heirs, successors and assigns." Compl. ¶ 13.

fraud putative class action where plaintiff alleged that class contained thousands of members "scattered throughout the United States," finding numerosity prong satisfied based on inferences drawn from admissions by defendant that over 12 million shares of stock were outstanding and average daily trading volume exceeded 100,000 shares after class period, and the court taking judicial notice of the fact that the average daily trading volume for the stock exceeded 100,-000 during the class period); *Kirby v. Cullinet Software, Inc.,* 116 F.R.D. 303, 306 (D.Mass.1987) (in securities fraud class action where 30 million shares of defendant corporation's common stock—held by 3,000 shareholders of record—were outstanding and nine million shares of the stock allegedly had been traded during class period, finding numerosity requirement satisfied because "an assumption that the class members are not so numerous as to make joinder impracticable would be, in light of the number of shares traded during the class period, ridiculous.") (internal citation and quotation omitted). *See also Grace v. Perception Tech. Corp.,* 128 F.R.D. 165, 167 (D.Mass.1989) ("Even if the number of persons who bought stock during the class period is unknown, numerosity can be assumed where the number of shares traded is so great that common sense dictates the class is very large.").

The Defendants, who do not contest that the numerosity requirement is satisfied, have, however, provided Razorfish common stock trading volume data for each day during the class period. *See* Exhibit C to Affidavit of Lawrence J. Portnoy ("Portnoy Aff.") in Support of Defendants' Opposition to Plaintiff's Motion for Class Certification ("Defendants' Opposition"). The average daily trading volume for the stock was well over 100,000 and for much of the class period the daily volume exceeded 1,000,000 shares. *See id.* The reasonable inference to be drawn from this trading volume information is that the putative class comprises hundreds, if not thousands, of members. Thus, one can reasonably infer that number of potential class members is too numerous to make joinder practicable. *See In re Relafen Antitrust Litig.,* 218 F.R.D. 337, 342 (D.Mass.2003) (finding that "forty individuals [are] generally found to establish numerosity."). The diffi-

culty that the size of the potential class poses for joinder is exacerbated by the geographical diversity of the class members, who are likely dispersed throughout the country. *See Kirby,* 116 F.R.D. at 306 (noting that "the plaintiffs also do not come from the same geographic area, which also supports a finding that the numerosity requirement is satisfied.").

Based on the reasonable inference that the putative class comprises hundreds, if not thousands, of geographically diverse members, I conclude that joinder is not practicable and that Swack has satisfied the numerosity prerequisite for class certification.

### 2. *Commonality*

■ The second hurdle Swack must clear en route to class certification is that of commonality, which requires her to demonstrate that "there are questions of law or fact common to the class," Fed.R.Civ.P. 23(a)(2), "but does not require that *every* question be common." *In re PolyMedica,* 224 F.R.D. at 35 (emphasis supplied). *See also Guckenberger,* 957 F.Supp. at 325 (noting that the "commonality" and "typicality" requirements of Rule 23(a) "do not require that all of the putative class members share identical claims; rather these prerequisites mandate only that complainants' claims be common, and not in conflict.") (internal quotations and citations omitted). Because "[a] *single* common legal or factual issue can suffice" to satisfy the 23(a)(2) requirement, "the commonality requirement ordinarily is easily met." *Payne,* 216 F.R.D. at 25 (emphasis in original) (internal citations omitted). The Rule 23(a)(2) commonality test has been described as a "low hurdle," *Duhaime v. John Hancock Mutual Life Ins. Co.,* 177 F.R.D. 54, 63 (D.Mass.1997), and "largely irrelevant," *Grace,* 128 F.R.D. at 167, where, as here, certification of the proposed class depends upon satisfaction of the more stringent requirement under Rule 23(b)(3) that common questions of law or fact predominate over individual ones.

Swack contends—and the Defendants do not contest—that the questions of law or fact common to the proposed class include the following:

(i) whether Defendants' research reports on Razorfish contained false or misleading statements and/or failed to disclose material facts;

(ii) whether the so-called truth-on-the-market defense is applicable;

(iii) whether Defendants' conduct constitutes a 'scheme' and/or 'course of business' under Rule 10b–5(a) and (c);

(iv) whether Defendants acted with *scienter*;

(v) whether Defendants' conduct caused the class members' losses;

(vi) whether the Class has sustained damages, and the measure of such damages.

Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification at 6 ("Plaintiff's Memorandum").

The common questions of conduct, causation, and harm identified by Swack underlie and are essential to the claims of all members of the proposed class. Moreover, these questions are of the sort that have been found by other courts to demonstrate the requisite commonality under Rule 23(a)(2). *See Kirby*, 116 F.R.D. at 306 (commonality requirement satisfied when common questions included "(1) [w]hether the statements and omissions complained of were false and misleading; (2)[w]hether they were made with the requisite scienter; (3)[w]hether the statements were material; (4)[w]hether the conduct alleged inflated the market price; and (5)[w]hether they were part of a common course of conduct designed to inflate the market price of [the defendant company's] stock") (internal citations omitted); *In re PolyMedica*, 224 F.R.D. at 36 (same); *In re Eaton Vance*, 219 F.R.D. at 43 (finding commonality requirement satisfied in securities fraud putative class action where "all the plaintiffs purchased shares in [one of the defendant's mutual funds] and all the plaintiffs allege that the defendants issued false and misleading statements in violation of Sections 11 and 15 [of the Securities Act of 1933]"); *Grace*, 128 F.R.D. at 167 (determining that where "all plaintiffs will have to prove the same misrepresentations and omissions, as well as their materiality and defendants' knowledge," the commonality requirement was met in a putative class action alleging securities fraud).

By demonstrating that there are questions of law or fact common to the class, Swack has satisfied the Rule 23(a)(2) prerequisite to class certification.

### 3. *Typicality*

■ The third prong of Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R.Civ.P. 23(a)(3). "The typicality requirement is satisfied when the [named] plaintiff's injuries arise from the same events or course of conduct as do the injuries that form the basis of the class claims, and when the plaintiff's claims and those of the class are based on the same legal theory." *Guckenberger*, 957 F.Supp. at 325 (internal citation omitted). As with the commonality requirement, the typicality requirement does not mandate that the claims of the class representative be identical to those of the absent class members.

The Defendants contend that Swack is atypical of the putative class members because she is subject to a unique defense—non-reliance—since she "did not rely primarily on the integrity of Razorfish's stock price when she acquired her shares." Defendants' Opposition at 5. An examination of potential unique defenses is necessary as part of the typicality analysis because "where a named plaintiff may be subject to unique defenses that would divert attention from the common claims of the class, that plaintiff cannot be considered typical of the class." *In re Bank of Boston*, 762 F.Supp. 1525, 1532 (D.Mass. 1991) (citing *Grace*, 128 F.R.D. at 169). The Second Circuit explained why unique defenses may lead to a finding of atypicality:

> While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses *which threaten to become the focus of the litigation.* ... [T]here is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d. Cir.1990) (emphasis supplied) (internal citations omitted), *cert. denied,* 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991).

The issue of what information Swack relied upon in her acquisition of Razorfish shares is relevant to this typicality analysis because this case is brought under what is known as the "fraud-on-the-market" theory.[18] Pursuant to this theory, plaintiffs alleging securities fraud need not establish individual reliance upon the allegedly false or misleading statements or material omissions by the defendants. Rather, as the Supreme Court held in its seminal fraud-on-the-market decision, *Basic Inc. v. Levinson,* 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988):

> [a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action.

In the Second Consolidated Amended Class Complaint, Swack invokes the fraud-on-the-market presumption of reliance. To establish typicality regarding reliance in a case brought under the fraud-on-the-market theory, the putative class representative must establish that she relied upon the integrity of the market in purchasing the securities at issue. *See Grace,* 128 F.R.D. at 168 (holding in case brought under fraud-on-the-market theory that "[p]laintiffs are typical if they relied on the integrity of the market to determine the price and value of the securities in which they traded.") (citing *Tolan v. Computervision,* 696 F.Supp. 771, 778 (D.Mass.1988)); *Kirby,* 116 F.R.D. at 307 (same).

That a putative class representative was exposed to and may have also relied upon variegated sources of information does not dictate the conclusion that she did not rely upon the integrity of the market. For example, reliance on the integrity of the market "includes reliance on 'statements of third parties [such as brokers] that merely reiterated, digested or reflected the misstated [market] information that forms the basis of the securities fraud claims.'" *Kirby,* 116 F.R.D. at 307 (quoting *Grossman v. Waste Management, Inc.,* 100 F.R.D. 781, 788 (N.D.Ill.1984)) (alterations in *Kirby*). Reliance on "secondary analyses of financial statements, such as Moody's or Value Line, and the advice of stockbrokers and friends," similarly would not defeat typicality with respect to market integrity reliance. *Grace,* 128 F.R.D. at 168.

Defining reliance on the integrity of the market broadly enough to encompass these several informational sources is necessary because:

> differing types of reliance are present in almost every securities class action. There will always be some individuals who read the financial statements directly, others who read the secondary analyses ... and many others who relied on the advice of stockbrokers or friends. If defendants' argument were to prevail that factual differences of this nature were sufficient to defeat class action certification, there could never be a class action of securities purchasers.

*Randle v. Spectran,* 129 F.R.D. 386, 391–92 (D.Mass.1988) (quoting *In re Data Access Systems Securities Litig.,* 103 F.R.D. 130, 137, 149 (D.N.J.1984)). So long as the investor "relied only upon information readily available to other investors," *Randle,* 129 F.R.D. at 392, or on "non-market information ... derived from market sources," *Grace,*

---

**18.** In *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court offered the following summary of the fraud-on-the-market theory:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore

> defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Id.* at 241–42, 108 S.Ct. 978 (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160–61 (3rd Cir.1986)).

128 F.R.D. at 169, market integrity reliance typicality should be found, even if the investor is herself a sophisticated investor. *See Kirby,* 116 F.R.D. at 308 (finding that the named plaintiff's sophistication regarding investing did not render him atypical because when "there is an imbalance of information available to investors on an open market, all such investors are harmed whether they are professionals or amateurs") (internal quotation marks and citation omitted); *Priest,* 118 F.R.D. at 555 (noting that "[s]ophistication does not make a plaintiff devoid of protection under the securities laws or immune to injury by misrepresentation.") (internal citations omitted).

A problem can arise, however, when the putative class representative has relied upon "information that is not generally available to the public, and hence to the unnamed class representatives." *Grace,* 128 F.R.D. at 169. In such an instance, "that purchaser cannot be said to have relied upon the integrity of the market," and therefore would be subject to a non-reliance defense should she attempt to invoke the fraud-on-the-market presumption of reliance. As Judge Keeton explained in *Grace:*

> Even though questions of reliance virtually disappear when plaintiffs employ a fraud on the market theory, if a plaintiff has relied on non-market information that plaintiff may be subject to unique defenses at trial. Such a plaintiff *could hurt the class he seeks to represent by having to litigate issues that solely relate to his special reliance.* The fraud on the market theory is specifically aimed at protecting open market purchasers who did not directly rely on any representations regarding the stock. Thus, if a plaintiff relies on representations, specifically those which are not available through market sources, then he cannot be said to have relied on the integrity of the market, and is atypical of those who have so relied.

*Grace,* 128 F.R.D. at 169 (internal citations omitted) (emphasis supplied). *See also Kirby,* 116 F.R.D. at 307 (holding that market integrity reliance would not "include reliance on factors wholly extraneous to the market such as insider information.") (internal quotations and citation omitted). *Cf. Priest,* 118 F.R.D. at 555 (finding plaintiff whose "invest-

ment decisions depended on information readily available to other investors and were not based on the type of knowledge available only to an institutional investor, or one who had direct contact with corporate officers" to have satisfied typicality requirement); *Randle,* 129 F.R.D. at 392 (same); *Modell v. Eliot Savings Bank,* 139 F.R.D. 17, 22 (D.Mass.1991) (rejecting defendants' atypicality argument where the "record fails to indicate that [the named plaintiff] acquired any inside information either directly or through his broker").

Not surprisingly, the parties stake out extreme positions on the issue of what, exactly, Swack relied upon in making her acquisition of Razorfish stock. Defendants' assert that in acquiring her Razorfish shares Swack "relied on nonpublic information about Razorfish and its senior management that she learned in private meetings and communications that she had with top Razorfish executives." Defendants' Opposition at 11. Swack counters that Defendants fail to "point to a single material, non-public fact that [Swack] learned from these conversations." Lead Plaintiff's Reply Memorandum in Support of her Motion for Class Certification at 3–4. Furthermore, Swack calls attention to the affidavit submitted in support of her motion for class certification in which she averred that she did not have any non-public information about Razorfish when acquiring the stock and in the transaction relied entirely upon the integrity of the market price of Razorfish stock. Rather than delve too deeply into credibility determinations at this early stage, I proceed on the assumption that Swack's reliance was mixed—*i.e.,* that it was based on both public and non-public information about Razorfish.

Defendants take the position that the reliance by Swack on any non-public information—no matter its quantum and even if Swack relied primarily upon the integrity of the market—renders her categorically atypical under 23(a). This thesis, however, proceeds from an excessively wooden view of how the litigation could or should be managed by the court and when the "unique defense" Swack faces ought to arise.

As set forth above, the typicality requirement is satisfied when (1) the injuries of the

proposed class representative arise from the "same events or course of conduct" as the injuries giving rise to the class claims, and (2) her claims and those of the class are based upon the same legal theory. *Guckenberger,* 957 F.Supp. at 325. There can be no doubt that Swack has as much, if not more,[19] interest in establishing fraud-on-the-market—the legal theory upon which her claims and those of the remainder of the class are based—as do the other members of the proposed class. The claim by the Defendants that Swack fails on the typicality prong because she is subject to a unique defense of non-reliance presupposes that this defense would be raised and fully litigated in conjunction with the resolution of the fraud-on-the-market issue. Surely, however, alternative procedures are available.

Because of the presence within the class of individuals who bought Razorfish stock at different points in time, the advisability of a bifurcated proceeding in this case seems clear. After first taking up the class-wide issue of fraud-on-the-market, a damages phase could follow if the trier of fact returned a verdict for the class. During this second phase, in which the plaintiff class would be parsed in various ways based upon the precise claims of its members, the Defendants would have the opportunity to raise specific defenses against individual plaintiffs or groups of plaintiffs. In other words, although an individual plaintiff could benefit from the class having established fraud-on-the-market during phase one, in order to recover damages he would have to defeat any defenses asserted against him by Defendants in phase two. This mechanism would seem to allow for the most efficient allocation of resources, streamlining the development of class-wide issues and reserving specific disputes regarding defenses and damages for resolution in subsequent, more tailored proceedings.

I reach this conclusion not based upon any preconception regarding the merits of Defendants' non-reliance defense against Swack,

but rather in light of what strikes me as the core principle underlying the 23(a) typicality inquiry. In endeavoring to protect the interests of absent class members, the court must ensure that the representative plaintiff will vigorously pursue legal theories that hold the potential for class-wide relief and not be distracted by stratagems beneficial solely to the class representative or, even worse, in conflict with the claims of the class. To that end,

> [t]he typicality inquiry is intended to assess ... whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented. The typicality criterion ·is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of the absentees.

*Baby Neal for & by Kanter v. Casey,* 43 F.3d 48, 57 (3d Cir.1994) (internal quotation marks and citations omitted); *see In re Oxford Health Plans, Inc. Securities Litig.,* 199 F.R.D. 119, 123 (S.D.N.Y.2001) (holding that "[t]ypicality requires that a class representative have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions.") (internal quotation marks and citation omitted); 7A Wright & Miller § 1764 (noting that "Rule 23(a)(3) assures that the claims of the named plaintiffs are similar enough to the claims of the class so that the representative will adequately represent them.").

Focused on this class-protective purpose— while also bearing in mind that if class certification is denied, it is exceedingly unlikely that individual class members will pursue their claims to recovery, given the economics of litigation in this field—I am unsatisfied with the sterile incantation by the Defendants that because Swack is subject to a

---

**19.** If the class conclusively established fraud-on-the-market, the so-called "hydraulic pressure to settle" presumably would be increased. To the extent Swack faces a potential defense of non-reliance, she would seem to have an interest in

reaching a settlement on favorable terms before having to litigate this issue, an outcome whose likelihood would be enhanced were the class to succeed on the fraud-on-the-market issue.

unique defense she categorically cannot be the class representative. If the question is whether Swack's incentives align with those of absent class members, the answer clearly is yes. Her claims against the Defendants rise or fall on the same legal theory—*i.e.*, fraud-on-the-market—as do those of the absent class members and, therefore, she has the same interest as they do in vindicating the theory. If, on the other hand, the concern is that the "unique defense" to which Swack is vulnerable will derail the litigation, consuming all of class counsel's time and energy and thereby injuring the interests of the absent class members, the bifurcation mechanism outlined above will provide an adequate safeguard.

 The mere fact that a putative class representative—whose claims arise from the same course of events and are based upon the same legal theory as the other members of the proposed class—is subject to a unique defense does not render her atypical for purposes of 23(a) *unless* that defense threatens to become the focus of litigation thereby prejudicing the absent class members. This reasoning is consistent with the rationale undergirding securities litigation decisions in which a putative class representative has been found atypical because he or she was subject to a unique defense. *See, e.g., Gary Plastic,* 903 F.2d at 180 (holding that "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation" because "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it"); *Grace,* 128 F.R.D. at 169 (basing finding of atypicality on conclusion that putative class representatives "may be subject to unique defenses at trial which would divert attention away from the common claims of the class members they seek to represent"); *Beck v. Status Game Corp.,* No. 89 Civ. 2923, 1995 WL 422067 at *1, *4 (S.D.N.Y. Jul.14, 1995) (holding that "a representative who faces a unique defense does not satisfy the typicality requirement because he would be required to devote considerable time to rebut the unique defense and would thereby prejudice other class members.") (internal quotation marks and citation omitted); *Kas v. Financial General Bankshares, Inc.,* 105 F.R.D. 453, 461 (D.D.C. 1985) (determining that "[w]here it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff ... then the named plaintiff is not a proper class representative."); *Grossman,* 100 F.R.D. at 788 (finding plaintiff atypical under Seventh Circuit test that turned on whether "it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff.") (internal quotation marks and citation omitted).

 To summarize, the typicality analysis is a functional one addressed primarily to the question of whether the putative class representative can fairly and adequately pursue the interests of the absent class members without being sidetracked by her own particular concerns. As to the first issue that will be litigated, namely the fraud-on-the-market issue—the legal theory of liability upon which Swack's claim and the claims of the absent class members depend—the answer is clearly yes. That Swack is subject to a unique defense and, perhaps, may realize no recovery on account of it, does not render her atypical for purposes of 23(a)(3) in light of the bifurcated process by which the case will be tried. Swack has satisfied the Fed. R.Civ.P. 23(a)(3) typicality prerequisite to class certification.[20]

---

**20.** I take up briefly the squabble between the parties regarding the decision by Judge Lindsay to deny Swack's motion for appointment as Lead Plaintiff in a separate, albeit topically related, matter. Approximately seven months after filing the present action, Swack filed suit against Lehman Brothers, Inc., alleging that it had artificially inflated the price of Razorfish stock, to the detriment of Swack and the putative class members, by publishing false and misleading analyst reports on the company and failing to disclose conflicts of interest that compromised the integrity of those reports. *See Swack v. Lehman Bros., Inc.,* Civil Action No. 03–CV–10907 (D.Mass.). As she did here, Swack moved in the prior case for appointment as Lead Plaintiff, which is generally a precursor to a later motion for designation as class representative. Unlike in the present case, however, the defendant opposed Swack's motion. In its opposition memorandum, the defendant argued that Swack did not "purchase" her shares of Razorfish stock on the open market, but rather obtained them through the merger agreement by which her company

#### 4. *Adequacy*

■ The fourth Rule 23(a) prerequisite requires the putative class representative to demonstrate that she will "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The Defendants argue that Swack does not satisfy the adequacy prong of 23(a) because she has made various "misleading submissions" in the course of the litigation thus far and "has not attempted to control the litigation or protect the interests of the class." Whatever self-interested motives the Defendants might have to sow dragon's teeth among the proposed class and its putative representative, the court remains under an independent obligation to test for "actual, not presumed, conformance with Rule 23(a).". *General Telephone Co.*, 457 U.S. at 160, 102 S.Ct. 2364. A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* at 161, 102 S.Ct. 2364.

As the Supreme Court observed in *General Telephone Co.*, the commonality, typicality, and adequacy-of-representation requirements bleed into one another:

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

*Id.* at 157 n. 13, 102 S.Ct. 2364. The First Circuit has interpreted the Rule 23(a)(4) adequacy prerequisite to entail a two part test: "[t]he moving party must show first that the interests of the representative party will not conflict with the interests of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.1985); *see Payne*, 216 F.R.D. at 26 (same).

The substance of the Defendants' credibility-related allegations against Swack concern her description of the circumstances under which she acquired and later sold her Razorfish stock and the information she relied upon when doing so. First, the Defendants claim that Swack's statement in an affidavit that she "did not have access to any non-public

was acquired by Razorfish. The defendant went on to argue that because of the particular circumstances under which Swack acquired the stock—which included her allegedly gaining access to non-public information—she was subject to the unique defense of non-reliance, rendering her unable to satisfy the class certification prerequisites of Rule 23(a), and, therefore, not an appropriate Lead Plaintiff. *See* Defendant's Opposition to Plaintiff's Motion for Appointment as Lead Plaintiff, Docket Entry # 7 in *Swack v. Lehman Bros.*, 03–CV–10907.

Both sides in the present action take liberties in characterizing the subsequent decision by Judge Lindsay in the *Swack v. Lehman Bros.* case. Defendants cite to a decision by Magistrate Judge Dein in yet a third case, *Coopersmith v. Lehman Bros.*, 344 F.Supp.2d 783, 787 (D.Mass.2004)—an action with which the *Swack v. Lehman Bros.* case was later consolidated upon Swack's motion—for the proposition that "Judge Lindsay denied her motion because 'she had not purchased her shares on the open market, but had actually obtained her shares when she sold her a [sic] company to Razorfish in a private transaction.'" Defendants' Opposition at 6. The words being quoted, however, are not

Judge Lindsay's, but rather those of Magistrate Judge Dein. Swack misses the mark as well, contending that in the *Swack v. Lehman Bros.* case "[n]o opinion was issued and no reasons were stated for that ruling. It should therefore have no persuasive value in this case, where Swack has been appointed lead plaintiff." Lead Plaintiff's Reply Memorandum in Support of Her Motion for Class Certification at 2 n.1.

The truth can be found somewhere between the positions staked out above. While it is true that Judge Lindsay did not issue a written decision in denying Swack's motion for appointment as Lead Plaintiff in the *Swack v. Lehman Bros.* case, he did enter an electronic order that set forth the basis for his decision as follows: "For reasons set out in the response of the defendant to this motion, it does not appear that Ms. Swack is the most appropriate party to serve as lead plaintiff." *See* Electronic Order of Aug. 13, 2003 in *Swack v. Lehman Bros.*, 03–CV–10907. In any event, the *Swack v. Lehman Bros.* decision does not dictate a particular outcome in the present action. Swack has already been approved as Lead Plaintiff and, for the reasons set forth in the main text, I find she has satisfied the typicality prong of 23(a).

information concerning Razorfish in connection with the sale of my business to Razorfish" is false. *See* Affidavit of Terry Swack in Support of Motion to Certify Class at 1. In support of this allegation, the Defendants argue that when Swack's deal with Razorfish closed, she had knowledge that both her company and at least one other company were being acquired, information that was not yet publicly disclosed. The Defendants also contend that Swack's pre-acquisition meetings with Razorfish executives "must have included non-public information about Razorfish." Defendants' Opposition at 12.

The allegations levied by the Defendants—in effect, that Swack is lying when she maintains that she did not obtain non-public information prior to agreeing to the acquisition deal—do not seriously undermine her credibility. Swack testified at length during her deposition about the substance of her pre-agreement meetings with various Razorfish executive. Her report of these meetings and their chatty, casual nature says more about the quality of her due diligence than her credibility. Unable to identify any specific non-public information obtained by Swack during these meetings, the Defendants resort to the hollow protestation that the meetings "must have included" it. Blind faith on the part of the Defendants that the facts must be thus carries the day no more in this context than it would at trial.

Nor am I persuaded by the Defendants' quibbles with the complaint and accompanying PSLRA certification filed by Swack, or their allegations related to her deposition testimony about why she decided to sell her Razorfish shares. With respect to the pleadings, the Defendants cry foul over Swack characterizing her acquisition of Razorfish stock therein as a "buy" and claiming to have "purchased shares" even though she acquired the securities in exchange for shares of her company, as well as her reciting a November 30, 1999 transaction date when the deal actually closed on December 1st. They term "incredible" Swack's testimony that her decision to sell was not influenced by any information gained from her year of working at Razorfish. Swack effectively counters each of these points, noting that a stock acquisition via merger agreement is a sale (and a corollary purchase by the other party) within

the meaning of the applicable statute and regulation, pointing to her deposition testimony in which she explained that the transaction date error was due to her "apparently poor memory of the exact date," and highlighting the reasonable explanation she had provided for her stock sale decisions.

The cases cited by the Defendants in support of their assault on Swack's credibility and, by extension, her adequacy as class representative, are factually distinguishable. In *Kline v. Wolf*, 702 F.2d 400, 403 (2nd Cir.1983), the court upheld that aspect of the district court decision denying class certification based upon the court's preliminary determination that the credibility of the putative class representatives was subject to "sharp attack." Although the district court made no final determination regarding the credibility of the two plaintiffs, the foundation had been laid for an assault far more damaging than that being pressed here. *See Kline v. Wolf*, 88 F.R.D. 696, 699–700 (S.D.N.Y.1981). One plaintiff in *Kline* claimed to have relied upon the subject company's annual report—one of the allegedly false and misleading statements upon which the lawsuit was based—in making his stock purchase, but his acquisition took place a month *before* the report was issued and approximately two months before it was disseminated to shareholders. *Id.* at 698–99. The other plaintiff in *Kline* alleged in her complaint that she had also relied upon the annual report but later admitted in deposition testimony that she had not relied thereupon in making her purchase, had no knowledge of the company's financial condition before buying the shares, and relied solely upon her husband's advice to enter the transaction. *Id.* at 699–700. The plaintiff's husband claimed first to have made the decision to buy "based solely" on the annual report, subsequently admitted to having never seen the report, and finally claimed to have relied upon advice from his broker "insofar as the broker knew of that company 'after (the 1978 Annual Report) was issued.'" *Id.* at 700. The broker, for his part, testified that he had not recommended the company, had never read the annual report, and had made no statements to

plaintiff's husband about the company's prospects or performance. *Id.*

As the district court concluded, the plaintiffs in *Kline* were subject to a "sharp attack on the verity" of their statements. *Id.* at 699. That attack was of significantly greater strength, however, than the one the Defendants level against Swack. Unlike the plaintiffs in *Kline*, Swack's testimony does not appear to conflict with the testimony of any non-interested witnesses—or any witnesses, for that matter—nor does it seem to be factually impossible along the lines of the reliance claim of the first *Kline* plaintiff discussed above.

So too in *Brider v. Nationwide Credit, Inc.*, No. 97 C 3830, 1998 WL 729747, *1 (N.D.Ill. Oct.14, 1998), the second case relied upon by Defendants. There the court concluded that the putative class representative "repeatedly gave false answers" in her deposition testimony, including several denials that she had been involved in any prior litigation when, in fact, she had been sued at least two times. *Id.* at *3–4. Again, the putative class representative in *Brider* was subject to a vulnerability different in kind from the credibility challenge that Swack faces. In the absence of any specific or clear evidence rebutting her allegations and testimony, my preliminary assessment is that Swack is a credible witness. The issue of her credibility, therefore, poses no real conflict of interest with the absent class members such that she could not meet the adequacy-of-representation requirement under 23(a).

The contention by the Defendants that Swack is an inadequate class representative "because she has not attempted to control the litigation or protect the interests of the class" is also unavailing. The record demonstrates that Swack has been actively involved in the litigation from the outset and has an appropriate understanding of the claims being advanced. Furthermore, Swack's selection of counsel was reasonable and informed. Swack first approached counsel seeking assistance in recovering the losses she had sustained due to the merger agreement with Razorfish. The mere fact that the resultant legal analysis suggested potential recovery against defendants other than the one Swack had anticipated does not render this "lawyer-driven" litigation, as the Defendants contend.

Swack easily satisfies the second prong of the adequacy test, which assesses whether "counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews*, 780 F.2d at 130. As demonstrated by the affidavit of Lead Counsel submitted in support of the motion for class certification, counsel has broad-based experience in complex litigation, including experience in securities fraud class actions in this district and others. I find no infirmity related to either the quality of representation or the commitment demonstrated by Swack's chosen counsel. I conclude, therefore, that Swack has met the adequacy of representation requirement of Rule 23(a)(4).

Having determined that Swack satisfies the four Rule 23(a) prerequisites, I take up the matter of Rule 23(b).

## C. Rule 23(b) Requirements

Pursuant to Rule 23(b)(3), under which Swack seeks to proceed, a case may be maintained as a class action if the 23(a) prerequisites are satisfied and, additionally, "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

### 1. *Predominance*

█ The dispute between the parties regarding the predominance requirement quickly devolves into a retreading of ground already covered during the motion to dismiss stage. To set the scene quickly, I note Swack argues that the issues of liability and damages are common to the class and, therefore that the predominance requirement of 23(b)(3) is readily satisfied. This argument proceeds from Swack's intention to satisfy her burden of proof on the element of reliance by employing the fraud-on-the-market theory discussed in greater detail in Part II.C.3 *supra* to establish a class-wide presumption of reliance on Defendants' allegedly fraudulent conduct. Citing the holding in *Basic* that the fraud-on-the-market reliance

presumption may be rebutted, *inter alia,* by demonstrating that "the misrepresentation in fact did not lead to a distortion in price," *Basic,* 485 U.S. at 248, 108 S.Ct. 978, the Defendants counter that Swack is not entitled to rely upon the presumption because she has failed to establish that the Defendants' allegedly false statements caused any artificial inflation in the share price of Razorfish stock during the relevant time period.

The matter of what, if any, showing a plaintiff seeking to benefit from the *Basic* presumption of reliance in a case based upon statements by research analysts—rather than those by securities issuers—must make at the class certification stage is an open question and one on which no circuit court of appeal has yet spoken. At the trial court level, the topic has been taken up recently by several judges in the Southern District of New York, who have reached different conclusions regarding the required showing.

First, in the *WorldCom, Inc. Securities Litigation,* the court determined that the plaintiffs were entitled to apply the fraud-on-the-market reliance presumption from *Basic* in an action based upon alleged misstatements by a research analyst. *See In re WorldCom, Inc. Securities Litig.,* 219 F.R.D. 267, 299–300 (S.D.N.Y.2003). In that case, the defendants launched a fierce challenge to plaintiffs' theory of the case, including the submission of a report by an expert witness who concluded that the data "[did] not demonstrate a causal link between [defendant's] analyst reports and movements in the price of Worldcom securities," and who argued that the *Basic* presumption could not be extended to the research analyst statements at issue. *Id.* at 299. In granting the plaintiffs' motion for class certification, the court noted with respect to the defendants' argument that "if this should in fact be treated as an argument concerning reliance," rather than a dispute about loss causation, "then it is one that applies equally to the entire class and does not demonstrate the existence of individual issues or overcome the predominance of the common issues." *Id.* at 300. The court further found that the defendants had failed to show that their expert's "analysis will succeed in rebutting the presumption of reliance such that it is appropriate to conclude that there will be no such presump-

tion available at trial and that individual issues will come to predominate over common ones." *Id.*

A subset of the defendants sought leave to appeal the certification decision, arguing that the district court had erred in extending the *Basic* presumption to analyst reports without first making a determination that those reports affected market prices. *See Hevesi v. Citigroup, Inc.,* 366 F.3d 70, 79 (2nd Cir.2004). In its decision granting leave for interlocutory appeal, the Second Circuit commented that the defendants had "offered a substantial legal argument in support of their position" and that "the issue presented in this case is not only novel but also significant," because the widened application of the *Basic* presumption "would extend the potentially coercive effect of securities class actions to a new group of corporate and individual defendants—namely, to research analysts and their employers." *Id.* at 79–80. The court expressly declined, however, to "decide what evidentiary showing, if any, the plaintiffs must make at the class certification stage in order to benefit from the *Basic* presumption in an action against research analysts and their employers," and the parties to the action reached a settlement before a decision on the merits was issued.

In a similar securities fraud lawsuit against an investment analyst and his employer, a second judge noted the "qualitative difference between a statement of fact emanating from an issuer and a statement of opinion emanating from a research analyst," and concluded that "no automatic impact on the price of a security [from an analyst statement] can be presumed and instead must be proven and measured before the statement can be said to have 'defrauded the market' in any material way that is not simply speculative." *DeMarco v. Lehman Bros.,* 222 F.R.D. 243, 246–247 (S.D.N.Y.2004). Regarding the question accepted for review in *Hevesi*—namely, what showing a plaintiff must make in order to benefit from the *Basic* presumption of reliance in a case based on analyst statements—the court held that:

the 'fraud-on-the-market' doctrine applies in a case premised on a securities analyst's

false and fraudulent opinions or recommendations only where the plaintiff can make a showing that the analyst's statements materially impacted the market price in a reasonably quantifiable respect. Whatever might need to be alleged to meet this standard at the pleading stage, the Court further holds that to qualify for class certification in a case where, as here, such certification is dependent on invocation of the fraud-on-the-market doctrine, the plaintiff must adduce admissible evidence that facially meets the aforementioned standard, *i.e.*, that makes a *prima facie* showing that the analyst's statements alleged to be false or fraudulent materially and measurably impacted the market price of the security to which the statements relate.

*Id.* at 247, 108 S.Ct. 978. The court denied the motion for class certification based upon its finding that "plaintiffs' proffered evidence does not remotely satisfy the aforementioned burden because, even when taken most favorably to plaintiffs, it does not warrant a finding that [the research analyst's] allegedly false statements materially impacted the market price of [the subject securities] in any reasonably quantifiable respect." *Id.*[21]

Several months later, a third judge articulated another standard under which to analyze, at the class certification stage, the utilization of the *Basic* presumption by plaintiffs alleging securities fraud by analysts and their employers. Following a discussion of the rulings in *WorldCom, Hevesi,* and *DeMarco,* the court ruled as follows:

> The Court declines to adopt a higher standard at class certification for plaintiffs alleging securities fraud by research analysts and their employers. Nothing in the holding of *Basic* or the text of Rule 23 requires it, and such a rule cannot be reconciled with the Second Circuit's clear admonitions in *Caridad* and *Visa Check/MasterMoney* that district courts not undertake to 'consider or resolve the merits of the claims of the purported class' at the class certification stage. While a

court may consider expert evidence at the class certification stage, the purpose of that consideration is not to evaluate the strength of plaintiffs' case on the merits of their claims, but to determine whether the requirements of Rule 23 have been met. As in *Visa Check/MasterMoney* and *Caridad,* the question for the Court is whether plaintiffs' evidence is 'sufficient to demonstrate common questions of fact . . ., not whether the evidence will ultimately be persuasive.'

*DeMarco v. Robertson Stephens Inc.,* 228 F.R.D. 468, 473–74 (S.D.N.Y.2005) (internal citations omitted).

The court went on to consider the reliance issue in the context of analyzing the Rule 23(b)(3) predominance requirement:

> Here, plaintiffs have demonstrated that they will be able to make a colorable presentation at summary judgment or trial as to the propriety of applying the fraud-on-the-market theory in this case. Defendants vigorously contest this argument, and the evidence in support of it, but it is clear that both plaintiffs' presentation and defendants' rebuttal will apply equally to the entire plaintiff class, and that the legal and factual issues raised by the controversy will be common ones. The elements of the fraud-on-the-market theory will form the core of plaintiffs' presentation to a factfinder on reliance, and that factfinder will conclude either that the class as a whole is entitled to the *Basic* presumption or that it is not. Thus, the existence of this dispute, however heated, does not demonstrate that individual issues will predominate over common ones.

*Id.* at 474–75.

In support of their argument that the fraud-on-the-market theory was applicable, the plaintiffs had submitted evidence including: (1) the 12.6% rise in the market price of the subject company's stock following the publication of a favorable research report by the defendant investment bank; (2) the de-

---

**21.** The evidence submitted by the plaintiffs in *DeMarco* to establish measurable impact consisted of: (1) various promotional materials issued by the defendant investment bank "mostly from a prior time period, touting [the analyst's] abilities and purported influence on the market"; and (2) the report of an expert witness whose method, the court concluded, was "so transparently unreliable as to be inadmissible as a matter of law." *DeMarco,* 222 F.R.D. at 248.

cline in the price of the stock on the day after the publication of a newspaper article detailing how the defendant analyst and some of his colleagues hold sold their own shares the stock while their employer maintained a "Buy" rating for it; (3) the role of the investment bank as the lead underwriter for the company and, accordingly, the "influence its pronouncements would have on the market"; and (4) the affidavit of an expert "attesting to the prevalence in the financial literature of 'robust' empirical results supporting a generally-accepted conclusion that analyst rating changes are 'associated with significant stock-price changes.'" *Id.* at 473.

The court characterized this as "weak" evidence on the issue of reliance and commented that "if [plaintiffs'] ultimate proof on reliance" extended no further, they "may have a slim chance of prevailing on the ultimate merits." *Id.* Nevertheless, citing the Rule 23(c)(1) direction that class certification be decided at an "early practicable time," the court concluded that the required showing at the class certification stage "must be less than that required to avoid summary judgment." *Id.* In accord with this determination regarding the quantum of proof required at class certification, the court ruled that:

at this stage of the litigation, by presenting a mix of market activity evidence, logical arguments, and statistical studies of the influence of at least some analyst statements, plaintiffs' have made 'some showing' of their ability to make a common legal and factual presentation on reliance to an eventual factfinder. That showing is not so grossly deficient that it can be definitively held at this stage that the argument will fail and plaintiffs will be required to prove individual reliance for each class member. To require a stronger showing at this stage would conflate the issue of whether common issues will dominate the merits decision with the merits decision itself.

*Id.* at 475 (internal citation omitted).

I find the analysis in *DeMarco v. Robertson Stephens* the most persuasive. Considering the required showing that plaintiffs must make to fall along a spectrum from less rigorous (motion to dismiss stage) to most rigorous (summary judgment stage), class certification falls closer to the former, be-cause it is conducted before the completion of substantive discovery. That being said, to give meaningful effect to the Rule 23(b)(3) inquiry in this context, where the plaintiffs seek to extend a proposition beyond its prior bounds (*i.e.,* applying the *Basic* presumption to statements by an analyst, as opposed to an issuer), the court may need to "probe behind the pleadings before coming to rest on the certification question." *Falcon,* 457 U.S. at 160, 102 S.Ct. 2364. Thus, I engage with the merits for a limited and focused purpose—namely, conducting a predictive exercise directed toward resolving the predominance question. *See Waste Management Holdings, Inc. v. Mowbray,* 208 F.3d 288, 298 (1st Cir.2000) (holding that "a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.").

In response to the Defendants' challenge on the issue of price inflation—and, relatedly, the applicability of fraud-on-the-market reliance—Plaintiffs have supplemented the record with an affidavit from an expert witness, R. Alan Miller ("Miller Aff."). Mr. Miller analyzed the price of Razorfish stock in comparison to a benchmark index that tracked companies, like Razorfish, that were "active in the Internet business sector." Miller Aff. at 9–10. Employing the index as a baseline, Mr. Miller calculated both the percentage change in the price of Razorfish stock, when compared to its closing price on the previous day, and also its net change relative to the percentage change experienced by the index on the day in question. *Id.* at 10–12. The analysis proceeded on the assumption that, as Mr. Miller phrased it, "in evaluating the impact of a statement, the comparison is properly made not with the last price preceding the statement, but with the price that would have resulted from the correct information being disclosed—i.e., absent the omission and misstatement." *Id.* at 3. Mr. Miller posited that a decline in the price of the stock was not necessarily inconsistent with artificial inflation due to fraudulent information. "If negative information (versus what was expected), for example, reaches market participants and at about the same time a positive news input occurs from another

(fraudulent) source, the stock price may still decline but not as much as it would have absent the positive news item." *Id.* at 4. Furthermore, Mr. Miller argued that when assessing the impact of analysts on market price the concept of "leakage"—*i.e.,* information from an analyst report that reaches the market and impacts prices prior to its official release—needed to be taken into account by not strictly limiting the impact inquiry to post-publication changes. *Id.* at 4–5.

In further support of his market-effect hypothesis, Mr. Miller cited a body of academic literature that "recognizes that analyst reports affect or impact upon stock prices either alone or as reinforcing information to company news or other analyst reports." *Id.* at 8. In his affidavit, Mr. Miller summarized five articles/studies, copies of which he attached, that either explicitly or implicitly endorsed the theory that analysts affect stock prices. *Id.* at 8–9; Exhibit B.

In response to the argument by the Defendants that Swack needed to identify a "damage formula" at the class certification stage, and also that assessing damages in the case would be "unmanageable" due to the quantity of data involved, Mr. Miller concluded that calculating damages, while labor-intensive, was feasible. *Id.* at 8. Mr. Miller explained that the degree of artificial inflation could be determined by comparing the price of Razorfish stock to a "true value line"—*i.e.,* the price the stock would have been absent the alleged omissions and misstatements by Defendants. *Id.* at 7. In terms of the precise method for generating the true value line, Mr. Miller opined that "fact discovery is necessary, and an appropriate methodology for determining the true value line would emerge therefrom, and may involve different methods or 'formulas' for different subperiods of the Class Period." *Id.*

To assess whether the Defendants had an impact on the market price of Razorfish stock, Mr. Miller examined movement in the stock price on days when the Defendants issued positive reports about Razorfish and also when the Defendants took other actions—for example, promoting the stock to CSFB investment clients—that stimulated the demand for the stock and, presumably, also thereby increased its price. *Id.* at 9–13. In conducting this analysis, Mr. Miller also considered other informational inputs regarding Razorfish—such as news released directly from Razorfish, the publication of reports from other analysts, etc.—that reached the market at or about the same time as Defendants' reports. *Id.* at 9.

The preliminary findings by Mr. Miller can be summarized thus: (1) on three dates when the Defendants issued a positive report regarding Razorfish and no other "major" information about the company reached the market, the "stock price moved clearly and in the expected direction," posting net gains of 17.65%, 5.23%, and 4.05% in comparison to the index; (2) on seven dates when the Defendants issued positive reports about Razorfish coinciding with the release of other good news about the company, "there may well have been CSFB impact as contributing to the mix," and the stock experienced net gains—ranging from 0.18% to 16.17%—in comparison to the index; and (3) on four occasions the price of the stock declined after Defendants issued a positive Razorfish report, but on the three occasions on which the drop was significant (*i.e.,* net changes of – 13.74%, –39.12%, and –15.08% versus the index change) Razorfish had announced "significant negative news" (for example, a quarterly loss) after the close of the market on the prior day and shortly prior to the issuance of the report. *Id.* at 9–12.

Mr. Miller concluded his affidavit with the following opinion:

> CSFB's reports and other activities did impact the stock price for Razorfish, and that the full impact of CSFB's activities on the market price or [sic] Razorfish stock can not be determined solely by examining price movements on the days that research reports were issued. Complete discovery of CSFB's activities with respect to Razorfish is necessary to establish the total artificial inflation which occurred as a result of CSFB's conduct.

*Id.* at 14. The affidavit from Mr. Miller, when considered in conjunction with the allegations in the Complaint, indicates that Swack will be able to put on a factual and legal case regarding the issue of fraud-on-the-market reliance that is common to the class.

The final argument advanced by the Defendants on the issue of predominance also falls short. The Defendants claim that because Swack has advanced a gradual dissipation theory—*i.e.*, that the inflationary effect of the Defendants' alleged misstatements dissipated over time as the market gradually learned the truth about Razorfish—she must show that inflation persisted throughout the class period. A failure by Swack to make this showing, so the Defendants contend, would render her unable to show that reliance, loss causation, and economic injury could be established via common proof.

Swack offers three counter-arguments. First, she asserts that the question of whether there was artificial inflation in the price of Razorfish stock is an issue common to the class, therefore supporting certification of the proposed class. Analogizing to the discussion by the First Circuit of variegated statute-of-limitations determinations in *Mowbray*,[22] Swack argues that the extent to which the differences, if any, in the level of price inflation at particular points in time affected class members differently does not preclude a finding of predominance because there exists a "sufficient constellation of common issues." Swack also counters the contention by the Defendants that any inflationary effect attributable to their statements would have dissipated quickly and, in any event, "long before the end of the class period." Swack points to the fact that CSFB issued positive reports regarding Razorfish within three months of the close of the Class Period and also that the conduct complained of is not limited to analyst reports but also encompasses other means by which the Defendants may have influenced the value of the stock. Finally, Swack argues that the record, in its current undeveloped state, does not permit the finding pressed by Defendants that the significant drop in the price of Razorfish stock over the Class Period demonstrates that any inflation had "completely dissipated" before the end of that period.

As the Defendants frame it, Swack "cannot now show that common issues predominate unless she *demonstrates* that Razorfish's stock price was artificially inflated by the Defendants' statements throughout the class period." The Defendants once again conflate the consideration of the merits with the 23(b)(3) predominance analysis. The question at hand is whether in attempting to demonstrate that the share price was inflated during the class period, "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3).

In his expert affidavit, Mr. Miller suggested a method—albeit one sketched out in rough terms and apparently dependent upon conducting extensive discovery in the case—for measuring the degree of inflation in the market price of Razorfish stock during the Class Period. Mr. Miller theorized that the approach "may involve different methods or 'formulas' for different subperiods of the Class Period." Parsing the class period in this manner, however, does not dictate a finding that individual issues predominate. The extent to which variations in the level of inflation from one day to the next impact individual class members differently will become a material issue only during the damages, rather than the liability, phase of the trial. As set forth above, procedural mechanisms are available for addressing this concern if and when it becomes necessary to do so. Furthermore, there is First Circuit precedent supporting a finding of predominance under 23(b)(3) even if individual issues may take center stage when it comes to damages. *See Smilow*, 323 F.3d at 40 (holding that "[t]he individuation of damages in consumer class actions is rarely determinative under

---

**22.** The Court in *Mowbray* held:

Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier. In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones. As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3). Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

*Mowbray*, 208 F.3d at 296.

Rule 23(b)(3)," and noting that "[w]here ... common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain"); *cf. Amchem Products*, 521 U.S. at 617, 117 S.Ct. 2231 (observing that "[w]hile the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all") (internal quotation marks and citation omitted).

Based upon Mr. Miller's affidavit, which attests to the feasibility of making damages determinations in this case, I find that this is not a situation in which "individual damages issues are especially complex or burdensome" such that class certification perhaps should be denied. *See Smilow*, 323 F.3d at 40, n. 8. Swack has sufficiently established that common questions will predominate in determining the existence and duration of any price inflation attributable to Defendants' conduct.

For the reasons set forth above, I find that Swack has made a sufficient showing—"some showing," in the words of the *Robertson Stephens* court—that common legal and factual issues will predominate in her presentation to the fact-finder on the issue of reliance. As for her likelihood of eventual success, I hue to my prior observation that her burden is a steep one. Nevertheless, because the Defendants have not demonstrated that she has absolutely no possibility of prevailing on her fraud-on-the-market reliance theory—however long the odds against her prevailing may be—it cannot be said that the case necessarily will require individuated showings of reliance. Accordingly, and in light of the procedural mechanisms discussed above, I find that Swack has satisfied the predominance requirement of Rule 23(b)(3).

### 2. *Superiority*

The analysis above regarding both the 23(a) requirements and 23(b)(3) predominance also militates in favor of finding that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P.

23(b)(3). Clearly, the piecemeal adjudication of numerous separate lawsuits covering the same or substantially similar issues—*i.e.*, the Defendants' allegedly illegal conduct and the impact thereof on the market price of Razorfish stock—would be an inefficient allocation of limited court resources. Furthermore, and even more importantly, is the very real risk that potential class members with relatively small claims would not have the financial incentives or wherewithal to seek legal redress for their injuries. Bearing in mind that the "core purpose of Rule 23(b)(3) is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation," *Smilow*, 323 F.3d at 41, I find that Swack has demonstrated that a class action lawsuit is superior to other methods for the "fair and efficient" resolution of this controversy.

### III. CONCLUSION

For the reasons set forth more fully above, Plaintiff's Motion for Class Certification is GRANTED.